# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70024

United States Court of Appeals
Fifth Circuit

**FILED**

November 30, 2017

Lyle W. Cayce
Clerk

PERRY ALLEN AUSTIN,

        Petitioner–Appellant,

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

        Respondent–Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before OWEN, ELROD, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Perry Allen Austin was convicted of capital murder in Texas state court and sentenced to death. The Texas Court of Criminal Appeals affirmed the trial court's judgment and subsequently dismissed Austin's state habeas petition as untimely. Austin filed a federal habeas petition. The federal district court granted summary judgment for the State and denied a certificate of appealability (COA). This court granted Austin a COA on fourteen of his twenty-one grounds. We now affirm the district court's judgment.

No. 13-70024

**I**

We briefly recount the pertinent facts leading up to Austin's trial for capital murder, as outlined in a prior opinion:

> In 1978, [Austin] raped one of his adolescent sisters at gunpoint and attempted to rape another, before robbing a third, older sister and his mother. . . . A jury convicted Austin of rape, attempted rape, and aggravated robbery.

> Following this conviction, Austin was released on parole in 1991 and began a sexual relationship with J.O., a fourteen-year-old female. Through J.O., Austin met D.K., a nine-year-old male. D.K. disappeared in August 1992. While investigating D.K.'s disappearance, police discovered Austin's relationship with J.O. and charges were brought against Austin. He pled guilty to sexual assault of a child and received a thirty-year sentence. In April 1993, D.K.'s remains were found. Although there was physical evidence connecting Austin to D.K.'s murder and Austin admitted that D.K. had been in his vehicle the day of D.K.'s disappearance, police did not believe they had sufficient evidence to prove Austin was responsible for D.K.'s murder.

> Austin alleges that prison conditions caused his mental health to deteriorate after he was incarcerated for sexually assaulting J.O. In 1995, he stabbed another prisoner and received an additional twenty-year sentence. By this point, Austin was confined in administrative segregation.

> In September 2000, Austin wrote a letter to a Houston police officer, stating that he would confess to D.K.'s murder if he would be guaranteed the death penalty. [Austin stated if that was not guaranteed, he would kill a prison guard as a way of guaranteeing himself the death penalty.][1] Austin was interviewed at the state prison and confessed orally and in writing to slitting D.K.'s throat with a knife because Austin was angry at D.K.'s brother for allegedly stealing drugs from Austin's car. Austin was indicted for capital murder on February 15, 2001. On March 21, Mack Arnold was appointed to represent Austin.[2]

---

[1] 14RR24.

[2] *Austin v. Davis*, 647 F. App'x 477, 480 (5th Cir. 2016) (per curiam).

2

No. 13-70024

Prior to his trial, Austin wrote a number of letters to the state trial court. In his first letter, Austin explained that he "[did] not want, nor require an attorney to represent [him]" and that he "[was] willing to face whatever consequences due [him] for [his] heinous and deplorable acts."[3]   He also indicated he would accept a death sentence and waive any appeals.[4]  He stated that he was "fully aware of [his] rights and [was] fully competent to stand before you and make these decisions."[5]  Austin explained that he had not had peace of mind since the murder, that his "mental stability [had] steadily decreased," and that he was using drugs again.[6]

Several months later, Austin wrote to the state trial court requesting to be released from administrative segregation or, alternatively, that his trial be moved to an earlier date.[7]  Austin reasoned that he had not had a disciplinary incident since entering the county jail and that, even though he was charged with capital murder, he suspected "others in population [had] similar charges."[8]  He further stated that he "[could not] handle prolonged isolation" because he "[has] a very bad problem with depression" and contemplates suicide often when depressed.[9]  Several weeks later, Austin again requested an earlier trial date.[10]  Austin explained to the state trial court: "No, I don't have a death wish, or at least you all can't prove it . . . .  I am fully competent and definitely know the difference between right and wrong."[11]  In his last

---

[3] CR at 5 (letter from Austin to the trial court file stamped May 15, 2001).
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] CR at 16 (letter from Austin to the trial court dated July 19, 2001); ROA.629.
[8] CR at 16; ROA.629.
[9] CR at 16.
[10] CR at 18 (letter from Austin to the trial court dated Aug. 8, 2001).
[11] *Id.*

## No. 13-70024

letter to the state trial court before the pretrial hearing to determine if Austin could represent himself, Austin again requested to proceed pro se, noting he was "fully aware of the consequences" and "aware that this is within [his] right."[12] He also stated that he did not wish to participate in jury selection and that he would "not contest any juror the prosecution selects."[13]

Prior to trial, Austin's counsel requested that the state trial court permit and authorize payment for a psychological examination of Austin by Dr. Jerome Brown, a clinical psychologist.[14] The trial court granted counsel's request,[15] although it appears that counsel did not immediately seek Dr. Brown's services.[16] The trial court held a conference in chambers six weeks later and explained to Austin that it wanted a psychological evaluation performed before it could decide whether Austin could proceed pro se.[17] The trial court ordered Dr. Brown to evaluate Austin to determine his competency to stand trial.[18] In his report, prepared after meeting with Austin, Dr. Brown noted that Austin "had no trouble providing relevant and coherent background information," was able to describe the charges against him and the court proceedings that had occurred, and could explain why he wanted to represent himself.[19] Dr. Brown concluded that Austin was "alert, well-oriented, and able to communicate his ideas without difficulty."[20] Dr. Brown also noted that

---

[12] CR at 20 (letter from Austin to the trial court dated Aug. 14, 2001).

[13] *Id.*

[14] CR at 12-13 (motion submitted May 30, 2001).

[15] CR at 11 (granting motion on July 13, 2001).

[16] 2RR3 (trial court referring to a previous conference in chambers six weeks before in which it noted that the evaluation had not yet occurred); Austin Br. at 15 (specifying that the conference occurred on August 27, 2001).

[17] 2RR3-4.

[18] CR at 24 (evaluation conducted on September 20, 2001).

[19] CR at 24-25.

[20] CR at 26.

No. 13-70024

Austin displayed no "bizarre verbalizations," hallucinations, or delusions typically indicative of severe mental illness nor did he exhibit any indication of disorganization, confusion, or other significant difficulties in communication.[21] Although the report acknowledged Austin's use of alcohol and drugs in prison, it did not otherwise mention any past mental health issues.[22] Dr. Brown concluded that Austin was competent to stand trial.[23]

After the evaluation, the state trial court held a pretrial *Faretta* hearing to consider Austin's request to proceed pro se. Under *Faretta v. California*, a criminal defendant has a right to self-representation.[24] To exercise that right, a defendant must competently, knowingly, and intelligently waive his right to counsel.[25] At the hearing, the trial court noted that it had read Austin's letters and spoken with Austin at a prior hearing.[26] The trial court also noted that it was in possession of Dr. Brown's report summarizing his evaluation of Austin's competency to stand trial.[27] The trial court asked Austin's counsel his opinion

---

[21] *Id.*

[22] CR at 24-26.

[23] CR at 26.

[24] *Faretta v. California*, 422 U.S. 806 (1975).

[25] *Id.* at 835 ("When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'") (internal citations omitted); *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) (noting that a defendant's "right to conduct his own defense . . . 'usually increases the likelihood of a trial outcome unfavorable to the defendant'" but recognizing that the "right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty" and that improper denial of the right constitutes structural error (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984))).

[26] 2RR3 (hearing held October 11, 2001).

[27] 2RR4.

5

as to Austin's competency. Counsel stated that, in his view, Austin was competent to stand trial and, in fact, "it has been [his] opinion from the first time [he] met him but out of an abundance of caution [he] requested the psychiatric evaluation."[28] The court then asked Austin a series of questions pertaining to his understanding of the possible consequences of representing himself and of the charges against him. Austin explained that he wanted complete control over trial strategy, although he agreed to standby counsel "[f]or legal advice only."[29] The court also asked Austin four questions about his mental health history.[30] Austin stated he had had no mental health issues.[31] The trial court issued findings, granted Austin's request to proceed to trial pro se, and appointed standby counsel.[32]

After the *Faretta* hearing, but before trial began, Austin submitted an affidavit to the state trial court, stating that he wished to have his court order for access to the law library rescinded because he thought "it [was] not necessary for [him] to attend additional [l]aw [l]ibrary sessions to research the

---

[28] *Id.*

[29] 2RR13.

[30] 2RR6-7.

[31] *Id.*

> THE COURT: Have you ever been declared mentally incompetent?
> AUSTIN: No, ma'am.
> THE COURT: Have you ever been treated for any mental health disorder?
> AUSTIN: No, ma'am.
> . . .
> THE COURT: Okay. Ever have any mental health problems while you were in the Army?
> AUSTIN: No, ma'am.
> THE COURT: Ever seek any mental health counseling while you were in the Army?
> AUSTIN: No, ma'am.

[32] 2RR14-15; CR at 32-33.

material needed to execute [his] defense."[33]  Austin later sent the trial court another letter requesting "all the evidence the prosecutor had against" him.[34] He also asked the state trial court about obtaining proper clothing for trial, and stated that he would like Arnold removed as his advisor because Arnold did not answer Austin's letters and because Austin "[did] not need him."[35]  In another letter to the state trial court before trial, Austin noted that he was "out of seg now so [was] no longer suffering bouts of depression" and that he was "still firm about [his] decision to not fight this case."[36]  He also stated that he "decided that it is not necessary for [him] to review [his] case file . . . [s]ince [he was] not going to put up any type of defense."[37]

Austin did not participate in jury selection.[38]  The trial court admonished prospective jurors during *voir dire* that if selected, each would be required to "render a verdict based on the law . . . not your personal opinion."[39]  Under Texas law, juries on capital cases must decide two special issues in the sentencing phase: (1) "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," and if so, (2) "[w]hether, taking into consideration all of the evidence . . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a

---

[33] CR at 36 (affidavit sworn on Dec. 5, 2001).

[34] CR at 60 (letter from Austin to the trial court dated Dec. 30, 2001).

[35] CR at 60-61.  A handwritten note on the letter, which appears to be mistakenly dated January 25, 2001 instead of January 25, 2002, suggests that Austin later stated at a hearing in open court that he would accept Arnold as standby counsel at trial.

[36] CR at 58 (letter from Austin to the trial court dated Feb. 19, 2002).

[37] *Id.*

[38] *See generally* vol. 3-8 of Reporter's Records (*voir dire* beginning Mar. 18, 2002).

[39] 3RR4.

death sentence be imposed."[40]  Each juror answered, under oath, that he or she could impartially decide whether Austin should be sentenced to life imprisonment or death.[41]  When empaneled, the jurors swore they would render a verdict according to the law and evidence.[42]

Austin pleaded guilty to capital murder.[43]  Before accepting Austin's plea, the trial court questioned Austin about his understanding of the charges against him and the possible penalties.[44]  The court also probed whether Austin's plea was voluntary.[45]  Austin stated he understood and was entering his plea voluntarily.[46]  The court accepted the plea.[47]  After the jury was sworn and admonished by the state trial court, the State presented the indictment and Austin entered his guilty plea before the jury.[48]  The punishment phase of the trial then proceeded.[49]

During the punishment phase, the State provided additional details regarding the offense, including that D.K was nine years old when he was killed.[50]  It also introduced the letter Sergeant Allen received from Austin in

---

[40] TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(1), (e)(1) (West Supp. 2002).

[41] *E.g.*, 4RR18-19 (juror Erwin's assurance that he could answer the special issues so as to produce a life or death sentence); 5RR4-5 (juror Condon's assurance that he could answer the special issues so as to produce a life or death sentence); 5RR32, 44 (juror Gibbs's assurance that he could answer the special issues so as to produce a life or death sentence, and would follow the law); 5RR48 (juror Tamayo's assurance that he could answer the special issues so as to produce a life or death sentence); 5RR67-68 (juror Finnegan's assurance that he could answer the special issues so as to produce a life or death sentence).

[42] 9RR7.

[43] 9RR4.

[44] 9RR4-7.

[45] 9RR4-5.

[46] *Id.*

[47] 9RR6.

[48] 9RR7-15.

[49] 9RR16.

[50] 9RR17.

January 2001, in which Austin stated that he would confess to the murder of D.K. if guaranteed the death penalty and, if that was not guaranteed, he would kill a prison guard to ensure he received the death penalty.[51]  The tapes of Austin's two interviews with Sergeant Allen—the first taking place immediately after Sergeant Allen received Austin's letter in 2001 and the second occurring before Austin's trial in 2002—were played to the jury.[52]  In the first interview, Sergeant Allen made clear that he could not promise or guarantee Austin anything in exchange for confessing to D.K.'s murder.[53]  Austin then described how he committed the crime.[54]  When Sergeant Allen asked Austin why he decided to confess, Austin replied, "I'm tryin[g] to clean myself up . . . . You know and studying the Bible, I'm not saying I'm a Christian, I'm not saying I'm getting religious you know. . . .  I need to clear all this up."[55]

In the second interview a year later, Austin again admitted to killing D.K., described why and how he committed the crime, and stated he confessed "[b]ecause [he] did it."[56]  When Sergeant Allen further inquired why Austin came forward in 2001, Austin answered, "Depression I guess."[57]  Austin stated:

> I couldn't stop dreaming about it, I couldn't stop seeing pictures of it.  So I just kept doing drugs[,] getting in trouble with doing drugs.  I had to stay high every day or else I would have to think about it.  And it really comes up mostly when I'm locked up in seg in solitary, you know.  Cause in seg and solitary I can't do no drugs[.]  I just

---

[51] 10RR25.

[52] 10RR28, 34-35.

[53] Pet. Ex. 34 at 000005.

[54] *Id.* at 000005-000016.

[55] *Id.* at 000020.

[56] ROA.840-45.

[57] ROA.852 (typed transcript of Feb. 21, 2002 interview with Austin contained in the federal district court's record on appeal).

got tired, the drugs weren't doing nothing really, they weren't helping. . . . I had written the letter a really long time before[,] I think I was depressed when I wrote that letter for at least ten years. . . . It used to [not] bother me, anything I did, it never bothered me but ever since this thing happened to him I'd be watching TV and I'd be thinking and I would just start crying[,] stuff like that.[58]

Austin explained that he had "been going to counseling and psychiatrists since [he] was a kid," that he "had behavioral problems," "was always in trouble at school," and "was emotionally disturbed."[59]  He stated that he "just want[ed] to get this over with and close it up," and that "[t]he only reason [he hadn't] killed [himself] is because" he "actually believe[s] there is a hell."[60]  He explained: "Put it this way[,] I'm not killing myself, I'm just not putting on a defense.  I regret something I did, I'm gonna pay for it[,] I'm not gonna make no excuses for nothing."[61]

Austin for the most part refrained from questioning witnesses and presenting evidence during the punishment phase.[62]  He did not testify.[63]  He briefly cross-examined an F.B.I. agent about Austin's relationship with J.O., specifically asking whether J.O.'s mother informed the agent that Austin used to date her before dating J.O. and whether J.O.'s mother told the agent that J.O. looked old enough to drink in bars.[64]  Austin made a closing statement,

---

[58] *Id.*

[59] ROA.853.

[60] *Id.*

[61] *Id.*

[62] *See generally* Reporter's Record vols. 9-11.

[63] 10RR78.

[64] 9RR125-26.

telling the jury he was violent, mean, and sometimes thought he had no conscience.[65] He also stated:

> I've been like this all my life, and I doubt if I'll change. What I wanted to say was they think I have a death wish. Well, that's not true. One of the reasons why I went ahead and confessed [to killing D.K.] was it was bothering me, what I did. Regardless of what everybody thinks, it does. I've never killed anybody before. And, . . . I also knew that my acts of violence would not stop even though I was in prison.[66]

He referred to an incident in prison in which he had "come real close to killing a [prison] guard" and that "[t]he only reason" he did not was that someone else stopped him.[67] He explained that "one of these days" there would not be someone to stop him, and he would "end up killing again."[68] Austin contested at closing the State's contention that he was a pedophile, asserting that J.O. looked older than she was.[69] He stated he was homosexual and described his sexual preferences.[70] Austin concluded his closing, telling the jury:

> On these special issues, there's no doubt that you will answer yes to No. 1 because if you send me to prison, I will commit further acts of violence. . . . Jail is a violent place, especially for somebody like me. I'm a homosexual. So, yes, I will commit further acts of violence in prison. Special Issue No. 2, there was no mitigating circumstances that contributed to killing [D.K.]. And fear, anger or whatever can never be considered anywhere near a reason for killing. So I suspect, you know, y'all, by law, have to answer that number as no.[71]

---

[65] 11RR15.
[66] 11RR15-16.
[67] 11RR16.
[68] *Id.*
[69] 11RR16-17, 19.
[70] 11RR18.
[71] 11RR19-20.

No. 13-70024

The jury answered Texas's special issues such that the trial court imposed a death sentence.[72]

The state trial court held a second *Faretta* hearing in which Austin waived his right to both appellate counsel and state habeas counsel.[73]  The court noted it had previously determined before trial that Austin was competent and it appointed standby appellate counsel.[74]  Pursuant to Texas law, Austin's case was automatically appealed to the Texas Court of Criminal Appeals (TCCA).[75]  Austin filed no brief.  The TCCA affirmed his conviction, noting that Austin had chosen to represent himself at trial and on appeal and that the "trial court [had] fully admonished [him] of the dangers and disadvantages of self-representation prior to trial and prior to this appeal."[76]  The TCCA stated it had, in the interests of justice, reviewed the entire record and found no unassigned fundamental error.[77]

Austin waived any pursuit of post-conviction relief and the trial court set Austin's execution date.[78]  Six days before his scheduled execution, Austin moved to have state habeas counsel appointed.[79]  The trial court withdrew the execution date and appointed Dick Wheelan as habeas counsel on September 24, 2003.[80]

---

[72] 11RR31; CR at 78-79.

[73] 12RR3, 8; CR at 84-85.

[74] CR at 86; ROA.22; ROA.595.

[75] *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(h) (West Supp. 2002).

[76] *See Austin v. State*, No. 74372, 2003 WL 1799020 (Tex. Crim. App. Apr. 2, 2003).

[77] *Id.*; *Ex Parte Austin*, No. 870377, Findings of Fact, Conclusion/Recommendation and Order, at 2 (June 29, 2004).

[78] ROA.23; ROA.595-96.

[79] ROA.596.

[80] *Id.*

No. 13-70024

Texas Code of Criminal Procedure, art. 11.071, § 4(a) provides that an application for a writ of habeas corpus "must be filed in the convicting court not later than the 180th day after the date the convicting court appoints counsel . . . or not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals, whichever date is later."[81] Wheelan determined that March 22, 2004 was the filing deadline for Austin's application for a writ of habeas corpus, counting 180 days from the date of his appointment.[82] Pursuant to Texas Code of Criminal Procedure, art. 11.071, § 4(b), Wheelan later requested a 90-day extension of time.[83] The state trial court granted his request.[84] On April 8, 2004, Wheelan filed with the TCCA a motion for leave to file a skeletal application for a writ of habeas corpus with leave to file an amended original petition by June 20, 2004.[85] The TCCA issued an order dismissing Wheelan's scheduling motion, holding that § 4(a) "should be interpreted" such that "'the date the convicting court appoints counsel' . . . shall mean the day the applicant waived counsel and chose to represent himself on habeas" and "'the date the state's original brief is filed on direct appeal' . . . shall mean the day the State waived its right to file a brief

---

[81] TEX. CODE CRIM. PROC. ANN. art. 11.071, § 4(a) (West 1999).

[82] Pet.'s Mtn. to Extend Time, *Ex Parte Austin*, No. 870377-A at *1-2 (Mar. 15, 2004); ROA.596.

[83] ROA.596; TEX. CODE CRIM. PROC. ANN. art 11.071, § 4(b) (West 1999) ("The convicting court, before the filing date that is applicable to the applicant under Subsection (a), may for good cause shown and after notice and an opportunity to be heard by the attorney representing the state grant one 90-day extension that begins on the filing date applicable to the defendant under Subsection (a).").

[84] *Ex Parte Austin*, No. 870377, Findings of Fact, Conclusion/Recommendation and Order, at 3 (June 29, 2004).

[85] ROA.596.

on appeal."[86]  The TCCA subsequently denied Austin's motion for leave to file an untimely application for a writ of habeas corpus.[87]

Austin filed a federal habeas petition.[88]  The State moved to dismiss the petition contending that Austin's claims were procedurally defaulted in light of the TCCA's denial of his state petition as untimely.[89]  The district court denied the State's motion.[90]  In its answer, the State argued Austin had insufficiently briefed a number of his claims.[91]  Austin then filed a first amended petition.[92]  The district court granted a stay to permit Austin to exhaust in state court new claims based on legislative changes to Texas's death penalty scheme.[93]  After Austin exhausted those claims,[94] he filed a second amended federal habeas petition.[95]  The State filed an answer.[96]  Austin then moved for funds for expert assistance in assessing his mental health and competency, which the district court authorized.[97]  Austin subsequently filed a

---

[86] *Ex Parte Austin*, No. 74372, slip op. at 3 (Tex. Crim. App. May 26, 2004) (not designated for publication).

[87] *Id.* at 4.

[88] ROA.20 (Austin's state habeas petition and his federal habeas petition are the same, according to the parties and the district court).

[89] ROA.155, 597-98; *Ex Parte Austin*, No. 59527-01, slip op. at 2 (Tex. Crim. App. July 6, 2004) (per curiam) (not designated for publication).

[90] ROA.598.

[91] *Id.*

[92] *Id.*

[93] ROA.1390; ROA.1465.

[94] *Ex Parte Austin*, No. 59527-02 (Tex. Crim. App. Apr. 5, 2006) (per curiam) (not designated for publication).

[95] ROA.5 (district court docket entry #38, not included in record on appeal but on file). This court denied a COA on Austin's Eight Amendment claims added in this second amended petition. The second amended petition is otherwise the same as the first amended petition.

[96] ROA.1687.

[97] ROA.1838; ROA.3488 (sealed).

response to the State's answer and a motion for an evidentiary hearing, supported by affidavits from mental health experts.[98]

In his petition, Austin outlined his history of mental illness, including suicide attempts in 1975 and 1979, as evidence that he was incompetent to stand trial, plead guilty, and waive counsel.[99]   We recount the evidence pertinent to Austin's claims.   After his suicide attempt in 1975, he was hospitalized and diagnosed with adolescent adjustment reaction in a mixed personality.[100]   Austin subsequently joined the army but was discharged in 1977 for "failure to adapt socially and emotionally."[101]   Following the aggravated rape of his sister and attempted aggravated rape of another of his sisters, as well as the aggravated robbery of a third sister and his mother in 1978,[102] Austin was evaluated by a psychologist, Dr. Franklin Lewis, before the trial occurred on those charges.[103]   Dr. Lewis diagnosed Austin with severe personality disturbance with schizoid thinking and anti-social features as well as latent borderline schizophrenia.[104]   He concluded that Austin was, at the time, suffering from a mental illness.[105]   Austin pleaded not guilty due to insanity.[106]   At trial, Dr. Lewis testified that there were indications that Austin had brain dysfunction or brain damage, although further testing would be required to make a determination.[107]   Austin again attempted suicide in 1979

---

[98] ROA.1930; ROA.2126.

[99] *See* Second Amended Pet. at 13; ROA.607; ROA.610.

[100] Second Amended Pet. at 14; ROA.607 (same assertion in first amended petition).

[101] Second Amended Pet. at 15.

[102] Pet. Ex. 3 at 005306, 005333; Pet. Ex. 5 at 001682.

[103] Pet. Ex. 28 at 002842-000043.

[104] Second Amended Pet. at 17; Pet. Ex. 28 at 002843.

[105] Second Amended Pet. at 17; Pet. Ex. 28 at 002843; Pet. Ex. 17 at 003675 (testifying at trial that Austin was "experiencing a mental illness" at the time of the assault).

[106] Pet. Ex. 5 at 001699; Pet. Ex. 28 at 002831.

[107] Second Amended Pet. at 17; Pet. Ex. 17 at 003674.

while awaiting trial.[108]   After he was convicted, he wrote to the trial judge requesting that he be placed at a state hospital to "get help for [his] problem," rather than sent to the Texas Department of Corrections (TDC).[109]  Although the trial judge forwarded Austin's letter to the Diagnostic Unit of the TDC,[110] Austin remained with the TDC for the duration of his sentence.[111]  A number of physical and psychological evaluations of Austin were conducted during this time period.[112]   There is some evidence that Austin did not wish to receive mental health counseling and was not cooperative while in the TDC or the Harris County Sheriff's Office.[113]

---

[108] Second Amended Pet. at 17; Pet. Ex. 28 at 002831.

[109] Second Amended Pet. at 17-18; Pet. Ex. 5 at 001699-001701 ("I [] did not [plead insanity] just to get out of going to T.D.C. I did it because I want help and I need help. . . . I know there[']s something wrong with me and I don't think prison[']s going to go help me any. I want to go to Rusk to get help for my problem. . . . All I'm asking is that you send me to Rusk until the doctors solve me of my problem then go ahead and send me to T.D.C. for life if you want to.").

[110] Pet. Ex. 5 at 001697.

[111] Second Amended Pet. at 18.

[112] *E.g.*, Pet. Ex. 28 at 002803 (TDC clinic notes 11/7/83; noting "probable nervous condition"), 002827 (mental health services notes 1/26/84; "has a history of antisocial behavior, substance abuse and sexual sadism coupled with self-mutilation"), 002825 (TDC clinic notes 5/6/86; referring him to psychiatric personnel), 002824 (clinic notes 2/3/88; "patient had good eye contract, oriented to time, person, and place and communicated effectively"); 002822 (clinic notes 12/18/89; "will refer to unit psychologist due to past . . . had not been seen since 8/10/88, had past suicide attempts").

[113] Pet. Ex. 15 at 004059 (Harris County Sheriff's Office Medical Services Division notes, 4/8/02; "Consumer states that he does not plan to seek counseling in TDC because only group therapy is offered and he does not want to discuss his problems in a group. He states that he feels that individual counseling has helped him."); 004071 (Pre-trial/screening intake notes, 2/25/02; explaining that although Austin met with a psychologist in the Wynne Unit in 1979 he "just saw [the psychologist] a couple of times but wouldn't cooperate;" also noted Austin would not cooperate with counseling in 1976); 004083 (Harris County Sheriff's Office Medical Services Division notes 1/24/02; Austin "strongly expressed that he did not want any services from MHMRA"); 004085 (Harris County Sheriff's Office Medical Services Division notes 10/18/01; Austin "states that he has no interest in obtaining psychiatric assistance"); 004094-99 (uncooperative); *see also* Docket Entry #47, Letter from Austin to the Fifth Circuit, received Sept. 17, 2014 ("I chose to abstain from medication and counseling . . . .").

No. 13-70024

Austin also asserted that the conditions of his confinement in the Texas prison system were "psychologically aversive"[114] and that he received no effective mental health treatment while incarcerated.[115] After Austin returned to the TDC to serve a thirty-year sentence for sexual assault of a child in 1992,[116] he stabbed another prisoner[117] and was placed in administrative segregation from 1995 until 1998. He asserts that the conditions of his confinement during this period, which he alleges included "unlawful violence by staff, sub-standard physical conditions and food, unlawful denial of exercise and educational materials, and prolonged periods of isolation," caused his mental health to deteriorate further.[118] Upon release from administrative segregation, Austin was placed in a "safekeeping" unit because he identified as a homosexual.[119] Austin contends that the conditions of safekeeping also negatively affected his mental health.[120] In 2001, he was again placed in administrative segregation after assaulting a prison guard.[121] A week later, Austin sent the letter to Sergeant Allen confessing to D.K.'s murder.[122] He contends that when he confessed, he was "[u]nder the influence of his mental illness and the severely depressive effects of his conditions of confinement."[123]

In support of his contentions in the federal habeas proceeding before the district court, Austin attached to his habeas petition the 2004 reports of a

---

[114] Austin Br. at 10.

[115] ROA.612-13.

[116] 14RR110.

[117] 14RR113 (judgment and sentence of additional twenty years on plea of guilty for aggravated assault with a deadly weapon).

[118] Austin Br. at 11; *accord* Second Amended Pet. at 28.

[119] Second Amended Pet. at 31; Pet. Ex. 36 at 001487.

[120] Second Amended Pet. at 31-32.

[121] *Id.* at 32; Pet. Ex. 26 at 003259 (offense report).

[122] 14RR24.

[123] Second Amended Pet. at 32.

17

neuropsychologist, Dr. McGarrahan,[124] and a neuropsychiatrist, Dr. Woods, both retained as part of his post-conviction investigation. He also submitted, in his motion for an evidentiary hearing, affidavits prepared by Dr. McGarrahan and Dr. Woods in 2012.[125] In her 2004 report, prepared after reviewing Austin's records and meeting with him, Dr. McGarrahan noted that Austin "endorsed continual suicidal ideation with a plan to cut his wrists with a razor blade" but "ha[d] no intent at [the] time because he ha[d] 'something to live for.'"[126] She opined that Austin's "overall pattern of cognitive performance suggests dysfunction of pre-frontal systems."[127] Dr. McGarrahan described Austin's thought processes as "goal-directed," but noticed "he evidenced brief delays in responding to questions and he occasionally lost his train of thought."[128] She noted that Austin "denied experiencing any auditory hallucinations and there was no indication of a fixed delusional system."[129] In Dr. McGarrahan's opinion, "[p]sychological testing revealed significant depression, history of problems with drugs, suicidality, history of physical aggression, antisocial behaviors, anxiety related to a traumatic event, identity problems and potential for self-harm."[130] She diagnosed Austin with a major depressive disorder, a cognitive disorder not otherwise specified, a polysubstance disorder, an anxiety disorder, and a personality disorder.[131]

---

[124] Dr. McGarrahan used her maiden name, Cicerello, in 2004.

[125] Austin Br. at 26; ROA.2145-56; ROA.2161-80.

[126] Pet. Ex. 93 at 007775.

[127] *Id.* at 007778.

[128] *Id.* at 007775.

[129] *Id.*

[130] *Id.* at 007778.

[131] *Id.*at 007779.

In his 2004 affidavit, Dr. Woods described Austin's suicidal ideation and suicidal behaviors and concluded that Austin's desire to not have a trial and to plead guilty were evidence he was not acting rationally.[132]  Dr. Woods explained that "Austin certainly understood the factual issues of his trial," "[h]e knew what he was being charged with," and he "understood the potential consequences of his false confession."[133]  In Dr. Woods' opinion, Austin "was capable of managing impressions and sought to minimize the appearance of any mental illness to ensure that his planned death could proceed."[134] Nonetheless, Dr. Woods concluded:

> [Austin was not able to rationally assist in the preparation of his defense] given his steadfast desire to die by the hands of the state. This suicidal ideation, based upon his mental disease and reinforced by his cognitively derived inability to effectively weigh and deliberate decisions at the time of their presentation rendered Mr. Austin incompetent to rationally weigh and deliberate his legal decisions.[135]

Dr. Woods also concurred in Dr. McGarrahan's diagnosis that Austin suffered from frontal lobe dysfunction.[136]  In Dr. Woods' opinion, Austin's "pre-existing and serious mental illness" was the "operating cause in his decision to kill himself."[137]

Austin also attached to his habeas petition an affidavit from Dr. Brown prepared in 2007 after Dr. Brown had reviewed Dr. McGarrahan's 2004

---

[132] Pet. Ex. 95 at 8-9.
[133] *Id.* at 11.
[134] *Id.*
[135] *Id.*
[136] *Id.* at 15.
[137] *Id.* at 16.

report.[138]  Dr. Brown noted that information "relevant and significant" to his 2001 competency evaluation of Austin was withheld by Austin "which might have provided information critical to the determination of his competency to stand trial."[139]   Dr. Brown concluded that it was "possible" that Austin's judgment was "significantly impaired by his mental difficulties" such that Dr. Brown's determination as to competency was incorrect in 2001.[140]  The State included in its answer to Austin's habeas petition another affidavit from Dr. Brown obtained in 2008.[141]  In that affidavit, Dr. Brown explained that, at the time of his 2007 affidavit, Austin had not provided him with the medical information previously withheld.[142]   Having reviewed the information not available at the time of his original evaluation of Austin in 2001, Dr. Brown concluded "there [was] nothing . . . that would justify changing my opinion, that would indicate that Mr. Austin's opportunity for a fair and impartial evaluation had been compromised because of what he withheld, or that additional evaluation, including more psychological testing or psychiatric interviewing, would have made any difference."[143]

Dr. Woods and Dr. McGarrahan also submitted affidavits prepared in 2012.   Dr. McGarrahan concluded that Austin "has a chronic issue with suicidal depression and that his suicidal depression appears to have been present at the time of his trial and competency evaluation . . . and likely impaired his ability to reason and make sound judgments."[144]   Dr. Woods

---

[138] Pet. Ex. 96.

[139] *Id.*

[140] *Id.*

[141] ROA.1710; ROA.1806-08.

[142] ROA.1806.

[143] ROA.1806-07.

[144] ROA.2150.

opined that Austin's jail records demonstrated he "was suffering from depression, suicidality, frequent crying spells, nightmares, racing thoughts, confusion, reduced sleep, irritability, and poor concentration."[145]  Dr. Woods concluded that "Austin's decision to pursue the death penalty was a direct result of contemporaneous depression and active suicidality" and that the decisions he made throughout trial and on appeal were thus irrational and involuntary.[146]

The district court granted summary judgment to the State and denied Austin's request for an evidentiary hearing.[147]  Although the district court held that the TCCA applied a new rule that could not be the basis of a procedural default, it concluded that Austin's claims were nevertheless foreclosed and denied a COA.[148]

While Austin's application for a COA was pending, Austin wrote a letter to this court indicating he desired to withdraw his appeal.  He stated:

> I wish to drop my appeals but can't seem to get any type of response nor cooperation.  I have informed my attorney of my wishes and according to him, to drop my appeals m[a]y actually prolong the date of my execution because the courts would then request a competency hearing.  If there is any way I could waive the compentency [sic] hearing I would gladly do it.  I was given a competency hearing just before my trial, and another just after, but before my direct appeals by the trial court.  I was found competent in both of those instances and see no reason for another one.

---

[145] ROA.2174.

[146] ROA.2177.

[147] *Austin v. Thaler*, 2012 WL 12537415 at *15 (S.D. Tex. Aug. 21, 2012); ROA.2767 (granting summary judgment and denying relief); ROA.2747 (denying motion for evidentiary hearing).

[148] *Austin v. Thaler*, 2012 WL 12537415 at *6, *15 (S.D. Tex. Aug. 21, 2012).

I have just recently completed the beginners['] course of the Blackstone Paralegal Institute with a[n] overall score of 99.51%. This is hardly a sign of incompetence. My TDCJ IQ score was 123 and my TDCJ EA Score was 12.9. Again, this is hardly a sign of incompetence. I do have a history of mental health issues, but nothing that can't be treated satisfactorily with medication and counseling. I chose to abstain from medication and counseling though and so see no reason why my mental health should keep me from dropping my appeals. Also, I recently read a court case in which your court ruled that a person could be mentally ill, but still be competent to be executed because that person was competent during their trial. In that case, that should also be the case in my case/appeals.[149]

We requested that the State and Austin's counsel respond to Austin's request to withdraw his appeals. Austin's counsel stated that Austin continues to suffer from serious mental illness and that nothing in Austin's letter "cause[d] . . . counsel to [abandon] the legal and factual propositions" advanced in the habeas petition and the COA.[150] Austin's counsel subsequently filed a motion for expedited consideration of the COA.[151] We noted that this motion conflicted with Austin's request to withdraw and we remanded to the district court "for the limited purpose of making findings as to whether Austin [was] presently competent to waive further appeals of his conviction and death sentence, and if Austin [was] found to be competent, whether such waiver is knowing and voluntary."[152] We subsequently received a letter from Austin,

---

[149] Docket Entry # 47 (letter from Austin to the Fifth Circuit received Sept. 17, 2014).

[150] Docket Entry # 53 (filed Oct. 9, 2014).

[151] Docket Entry # 62 (filed Nov. 14, 2014).

[152] *Austin v. Stephens*, 596 F. App'x 277, 278 (5th Cir. 2015) (per curiam).

written prior to the remand, stating that he wished us to either deny his request for a COA or grant his motion to withdraw his appeal.[153]

Before the district court held a competency hearing in accordance with the remand, Austin moved to withdraw his pro se request to withdraw his appeal.[154] In May 2015, Austin filed a pro se letter with this court again stating he did not feel another competency evaluation was necessary and renewing his request for an expedited review and denial of his appeals.[155] Austin explained: "We all know that I am guilty and that all the previous psychological evaluations I received that found me to be mentally unstable was in error because of my deception."[156] Austin stated he had taken psychology classes and was knowledgeable about manipulating others.[157] Shortly thereafter, Austin sent this court another letter stating that he no longer wished to have legal representation, that a competency hearing was not necessary because he had already had two, and that he would not answer questions in the event a competency evaluation was ordered.[158] In July 2015, Austin wrote to the court reiterating his request that the court deny his COA.[159] He requested that he be permitted to proceed pro se.[160] He again stated he would not answer questions in any court-ordered competency evaluation and that "[a] *Faretta* hearing [was] also not necessary as [he had] already had two of them, once

---

[153] Docket Entry # 73 (letter from Austin to the Fifth Circuit written January 6, 2015 and received January 12, 2015).

[154] Docket Entry # 75 (motion from Austin's counsel and letter from Austin).

[155] Docket Entry # 82 (letter from Austin to the Fifth Circuit dated May 10, 2015).

[156] *Id.*

[157] *Id.*

[158] Docket Entry # 84 (letter from Austin to the Fifth Circuit dated May 20, 2015).

[159] Docket Entry # 91 (letter from Austin to the Fifth Circuit dated July 26, 2015).

[160] *Id.*

when [he] chose to represent [himself] during [his] trial and again when [he] chose to represent [himself] during [his] direct appeal."[161]  Austin explained:

> If any are wondering what my motives are for all of this, it's quite simple.  I wish to be executed.  Either that, or give me Life Without Parole.  One or the other. . . .  I do not want out of prison.  I am probably one of the very few guys in prison who readily admit that I belong in prison. . . .  When I was first bench warranted back to the county jail in 2001 I was asked what was it I wanted.  I asked if I could be guaranteed a Life sentence without ever being brought up for parole.  When I was told that couldn't be guaranteed, I chose death.  If you looked at the trial transcript and everything else you can see that at no point did I contest the state.  I only picked up my appeals because in a moment of weakness I allowed a woman to convince me to pick them up.  That woman is no longer a factor in my life.[162]

In November, 2015, Austin sent another letter to this court requesting denial of his appeal.[163]  He restated that he had taken psychology classes, was "good [at] manipulation," and had deceived mental health experts previously.[164]  This court subsequently granted in part and denied in part Austin's COA.[165]  In November 2016, Austin again wrote to the court requesting a denial of his appeal.[166]  In reference to the claims raised concerning his mental health issues, Austin stated he "[could] guarantee this court that I am now, and always have been fully competent."[167]  He again suggested he had previously deceived mental health experts and manipulated

---

[161] *Id.*

[162] *Id.*

[163] Docket Entry # 97 (letter from Austin to the Fifth Circuit filed Nov. 20, 2015).

[164] *Id.*

[165] *Austin v. Davis*, 647 F. App'x 477 (5th Cir. 2016) (per curiam).

[166] Docket Entry # 145 (letter from Austin to the Fifth Circuit dated Nov. 27, 2016).

[167] *Id.*

a polygraph test.[168]  He also explained that he had refused visits from his attorney because the visits often required him to miss meals.[169]  In this letter, he stated he would cooperate with a mental health evaluation but only if it was conducted at the prison because he did not want to be bench warranted back to the county.[170]

## II

"In a federal habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo."[171]  Our review of this federal habeas petition is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).[172]  Under AEDPA, if a claim was adjudicated on the merits by a state court, § 2254(d) provides that a federal court cannot issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[173]  Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct" and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[174]

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006) (citing *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001)).

[172] 28 U.S.C. § 2254.

[173] 28 U.S.C. § 2254(d).

[174] 28 U.S.C. § 2254(e)(1).

No. 13-70024

Austin did not file a brief on direct appeal; no federal claims challenging his conviction were presented to the TCCA in its automatic review of his conviction and sentence. The federal claims presented in his state habeas petition were rejected by the TCCA on procedural grounds. Accordingly, there has been no adjudication on the merits of Austin's habeas claims to which this court can apply § 2254(d) deference.[175] We consider the standard of review applicable to each of Austin's claims in our analysis of them.

### III

We first address whether Austin's claims are procedurally defaulted. The TCCA held that Austin's application for habeas relief was untimely under Texas Code of Criminal Procedure, art. 11.071, § 4(a), which sets the filing deadlines for Texas state habeas petitions.[176] The TCCA reasoned that § 4(a) should be interpreted to require filing no later than 180 days after Austin waived habeas counsel or 45 days after the State waived its right to file a brief on appeal.[177] The district court concluded that the procedural rule had not been clearly announced nor regularly followed because the TCCA had never before interpreted the statute in such a way.[178] Accordingly, it determined that the rule could not be the basis for a procedural default.[179] We agree. We also

---

[175] *Cf. Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005) (relying on § 2254(d) to define "claim" for purposes of § 2244(b) and stating that both statutes together "make clear that a 'claim' as used in § 2244(b) is an asserted federal basis for relief from a state court's judgment of conviction"); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) ("[W]e hold that a state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for the purposes of § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the substance of the constitutional claim advanced . . . .").

[176] *See Ex Parte Austin*, No. 74372, slip op. at 2-4 (Tex. Crim. App. May 26, 2004) (not designated for publication).

[177] *Id.*

[178] ROA.2777.

[179] *Id.*

26

No. 13-70024

note that the State has affirmatively set forth in its brief in this court that it does not challenge the district court's ruling that the state procedural ground was inadequate.[180]

## IV

Austin contends that he was not competent to waive his right to counsel, stand trial, or plead guilty (Issue 10) and that the state trial court's determination as to competency was not entitled a presumption of correctness under 28 U.S.C. § 2254(e)(1) (Issues 2, 3 and 4).[181] He also argues that the state trial court's procedures were not adequate to ensure he was competent (Issues 6, 7, 8, 9).[182] Austin presents evidence of his mental health history which he contends demonstrates his incompetence.[183] In a closely related claim, Austin asserts that his waiver of counsel and guilty plea were not knowing and voluntary because of his mental illness and the coercive conditions of his confinement (Issues 16, 17).[184] He also argues that the district court improperly deferred to the state trial court's determinations that Austin's guilty plea and waiver of counsel were knowingly and voluntarily made (Issue 2 and 15).[185]

---

[180] State Br. at 16 n.3.
[181] *See* Austin Br. at 77, 47, 49. Issue 3 relates to Austin's assertion that the federal district court erred in crediting and relying upon evidence offered by the State in its summary judgment motion. As we noted in our partial grant of a COA, these arguments relate to the federal district court's procedure, are not separate grounds for relief, and are arguments we consider in connection with Austin's substantive claims.
[182] *See* Austin Br. at 54, 57.
[183] ROA.2145-56; ROA.2161-80.
[184] *See* Austin Br. at 102.
[185] *See* Austin Br. at 47, 93.

No. 13-70024

## A

"[T]he Constitution does not permit trial of an individual who lacks 'mental competency.'"[186]  A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as factual understanding of the proceedings against him."[187]  The Supreme Court concluded in *Maggio v. Fulford* that competency to stand trial is a question of fact.[188]  In *Felde v. Blackburn*, this circuit relied on *Fulford* in determining that a state court's finding of competence to stand trial is a finding of fact.[189]  We have reiterated that holding in a number of cases.[190]  In *Washington v. Johnson*

---

[186] *Indiana v. Edwards*, 554 U.S. 164, 170 (2008); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

[187] *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); *see also Godinez v. Moran*, 509 U.S. 389, 396 (1993).

[188] *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam); *see also Thompson v. Keohane*, 516 U.S. 99, 113 (1995) (noting the "practical considerations that have prompted the Court" to consider competency a "factual issue," namely that the trial court has a "superior capacity to resolve credibility issues"); *Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (per curiam) (considering the state court's conclusion regarding the defendant's competence to be a factual finding); *Miller v. Fenton*, 474 U.S. 104, 114 (1985) (noting that the distinction between questions of fact and questions of law often turns upon which "judicial actor is better positioned than another to decide the issue in question;" if "the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight.").

[189] *Felde v. Blackburn*, 795 F.2d 400, 402 (5th Cir. 1986) ("The state court's finding of mental competence to stand trial . . . is a finding of fact entitled to a presumption of correctness . . . .") (citing *Fulford*, 462 U.S. at 116-17).

[190] *Miller-El v. Johnson*, 261 F.3d 445, 454 (5th Cir. 2001) ("A state court's competency determination is a finding of fact entitled to a presumption of correctness under § 2254(d)(2)."), *rev'd on other grounds*, 537 U.S. 322 (2003); *Carter v. Johnson*, 131 F.3d 452, 460 (5th Cir. 1997) (treating the question of competency as a factual determination); *Flugence v. Butler*, 848 F.2d 77, 79 (5th Cir. 1988) ("A medical inquiry into competency is a fact-finding exercise, and the factual finding of competence is presumed to be correct.").

and *Bouchillon v. Collins*—two decisions issued after *Felde*— we treated the question of competency as a mixed question of law and fact.[191] This circuit's rule of orderliness, however, provides that "one panel of our court may not overturn another panel's decision, absent an intervening change in the law."[192] Because we are bound by this circuit's rule of orderliness, and the earlier panel decision controls,[193] we adhere to *Felde* and to *Fulford* and consider competency a question of fact.[194]

Section 2254(e) limits our review of state-court fact findings,[195] even if no claims were presented on direct appeal or state habeas.[196]    Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be

---

[191] *Washington v. Johnson*, 90 F.3d 945, 951 (5th Cir. 1996) ("The question of competency is treated in our circuit as a mixed question of law and fact."); *Bouchillon v. Collins*, 907 F.2d 589, 593 n.11 (5th Cir. 1990) ("[T]he determination of competency is not solely a 'factual issue,' but rather is a mixed question of fact and law.").

[192] *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (per curiam) (quoting *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)).

[193] *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 410 (5th Cir. 2006).

[194] *Cf. United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010) (per curiam) (recognizing, on appeal of conviction in federal court, that competency to stand trial is a factual determination); *United States v. Mackovich*, 209 F.3d 1227, 1232 (10th Cir. 2000) (same); *Vogt v. United States*, 88 F.3d 587, 591 (8th Cir. 1996) (same); *United States v. Winn*, 577 F.2d 86, 92 (9th Cir. 1978) (same).

[195] *Virgil v. Dretke*, 446 F.3d 598, 610 n.52 (5th Cir. 2006) (applying § 2254(e)(1) to a state trial court's implicit factual finding).

[196] *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (concluding that even when § 2254(d) does not apply, § 2254(e) still applies such that a state court's factual determinations are presumed correct); *see Sharpe v. Bell*, 593 F.3d 372, 379 (4th Cir. 2010) ("The deference Section 2254(e)(1) requires has particular salience when a state court's determinations closely track the legal issues before the federal habeas court.  Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does . . . , Section 2254(e)(1) requires that the state court's findings of fact not be casually cast aside."); *see also Loden v. McCarty*, 778 F.3d 484, 494 (5th Cir. 2015) (noting that § 2254(e) "constrains the discretion of district courts to grant evidentiary hearings," even "[w]here section 2254(d) does not apply"); *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (Section 2254(e)(1) "pertains only to a state court's determinations of particular factual issues, while § 2254(d)(2) pertains to the state court's decision as a whole") (citing *Miller-El v. Cockrell*, 537 U.S. 322, 341-42 (2003)).

No. 13-70024

presumed to be correct" and the habeas petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."[197] To the extent Austin's claims challenge factual determinations made by the state trial court, we apply § 2254(e)(1).  To the extent Austin's claims present questions of law and mixed questions of law and fact, such that § 2254(e) does not apply, we review de novo.[198]  Because competency is a question of fact, we afford the state trial court the deference due under § 2254(e)(1).[199]  Under § 2254(e)(1), the state trial court's determination that Austin was competent to stand trial, waive counsel, and plead guilty is presumed correct.  Austin bears the burden of rebutting that presumption of correctness by clear and convincing evidence.[200]  Out of an abundance of caution, however, we will also consider, in the alternative, whether Austin is entitled to habeas relief if Austin's competency claims are subject to review as a mixed question of law and fact.

The trial court conducted a pretrial hearing following an expert's evaluation of Austin's competence to consider Austin's motion to proceed pro se.  Although the primary purpose of the hearing was to determine Austin's ability to represent himself,[201] the trial court addressed the question of Austin's competency to stand trial and waive counsel in making that determination.[202]  The transcript of the hearing also reflects that the state trial

---

[197] 28 U.S.C. § 2254(e)(1).

[198] *See Henderson v. Cockrell*, 333 F.3d 592, 597-98 (5th Cir. 2003).

[199] *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

[200] 28 U.S.C. § 2254(e)(1).

[201] 2RR4.

[202] *See Godinez v. Moran*, 509 U.S. 389, 400 (1993) (holding that waiver of the right to counsel must be made competently, knowingly and voluntarily to be constitutionally effective).

court was evaluating whether Austin was competent to stand trial.[203]  In finding Austin competent to stand trial and to waive trial counsel, the state trial court relied on its own interactions with Austin, his written letters to the court, his demeanor in court proceedings, and his responses to the trial court's questions.[204]  The trial court also relied on the professional opinion of Dr. Brown, who conducted a competency evaluation of Austin prior to the first *Faretta* hearing.[205]  Finally, the trial court relied on the opinion of Austin's counsel as to Austin's competency.[206]  We conclude that the state court's competency determination is well supported by the record.

Although Austin presents evidence of mental illness in his federal habeas petition, he has not demonstrated by clear and convincing evidence that he was not competent to stand trial, waive counsel, or plead guilty.  He contends that the evidence presented in his habeas petition—including records of two suicide attempts over twenty years before his capital murder trial as well as expert reports highlighting his suicidality and depression— demonstrates he was not competent before, during, or after trial.  A history of suicidality and depression, however, does not render a defendant

---

[203] *See* 2RR3-6 (referencing and relying upon Dr. Brown's report, prepared to determine if Austin was competent to stand trial, asking Austin's counsel whether he considered Austin to be competent, and asking Austin a series of questions about his mental health history); *see also* 12RR3 (the state trial court noting at a later *Faretta* hearing that it had previously conducted a hearing and found Austin "was competent to represent himself and was making that decision freely and voluntarily with full knowledge of the potential consequences").

[204] 2RR5-14.

[205] 2RR4 ("[T]he Court appreciates the fact that the evaluation has been done.  It is probative information for the Court on making a determination on his ability to represent himself.").

[206] *Id.* (Austin's counsel confirming his personal determination that Austin was competent and stating that "it has been [his] opinion from the first time [he] met him but out of an abundance of caution I requested the psychiatric evaluation").

incompetent.[207]  Austin clearly demonstrated an understanding of the charges against him and the possible consequences, as well as an ability to make strategic choices and to communicate clearly to the state trial court.  As Austin's own expert explained, "Austin certainly understood the factual issues of his trial" and "[h]e knew what he was being charged with."[208]  The evidence Austin presents is insufficient to overcome the indicators of competence noted and relied upon by the state trial court.

Austin argues that his decision to waive counsel and plead guilty to capital murder demonstrates incompetency.  The fact that a particular defendant "caus[es] his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty," however, is not sufficient for a finding of incompetency.[209]  This circuit has recognized that a defendant's deliberate use of the system to obtain the death penalty is evidence of rationality, not incompetence.[210]  Again, we presume the state trial court's

---

[207] *See Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000) (noting a suicide attempt must be weighed with other evidence relating to a defendant's competence); *see also Drope v. Missouri*, 420 U.S. 162, 181 n.16 (1975) (recognizing that "a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion'" (quoting David F. Greenberg, *Involuntary Psychiatric Commitments to Prevent Suicide*, 49 N.Y.U. L. REV. 227, 236 (1974))).

[208] Pet. Ex. 95 at 11.

[209] *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004); *Autry v. McKaskle*, 727 F.2d 358, 362 (5th Cir. 1984) (per curiam) (recognizing that refusing to "plead for mercy" in a capital murder case does not necessarily mean that a defendant is incompetent or acting irrationally); *see also Taylor v. Horn*, 504 F.3d 416, 435 (3d Cir. 2007) ("Taylor's desire to confess and receive the death penalty as punishment, and refusal to allow witnesses during the penalty phase, are not indications that he was incompetent.  These actions are consistent with Taylor's repeatedly expressed desire to plead guilty and accept the consequences.").

[210] *See Roberts v. Dretke*, 381 F.3d 491, 494, 498 (5th Cir. 2004) (concluding that the defendant's instruction to trial counsel to "steer the trial towards imposition of the death penalty" was not irrational nor evidence of incompetency, but instead suggested that the defendant was "quite capable of conversing with his trial counsel regarding trial strategy, and was not only able to participate in his defense but was also able to direct it").

32

No. 13-70024

determination regarding Austin's competency is correct; Austin has not overcome that presumption by clear and convincing evidence.[211]

Even if, in the alternative, we were to consider this claim a mixed question of law and fact, such that § 2254(e)(1)'s presumption of correctness does not apply to the competency determination and our review is instead de novo, Austin has failed to demonstrate that he is entitled to habeas relief. His prior mental health issues as well as his strategy before, during, and after trial are simply insufficient to support a determination that Austin was incompetent.

## B

Austin asserts a number of procedural due process claims under *Pate v. Robinson*[212] relating to the state trial court's determination of competency. "Under *Pate v. Robinson*, a trial court must hold a competency hearing when there is evidence before the court that objectively creates a bona fide question as to whether the defendant is competent to stand trial."[213] "In determining whether there is a 'bona fide doubt' as to the defendant's competence, [a] court considers: (1) any history of irrational behavior, (2) the defendant's demeanor at trial, and (3) any prior medical opinion on competency."[214] "If the trial court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, yet failed to make further inquiry, the defendant has

---

[211] 28 U.S.C. § 2254(e)(1).

[212] 383 U.S. 375, 385 (1966) (holding that a trial court must hold a competency hearing when there is evidence before the court that objectively creates a bona fide question as to whether the defendant is competent to stand trial); *see also Roberts v. Dretke*, 381 F.3d 491, 497 (5th Cir. 2004) (articulating the holding in *Pate v. Robinson*).

[213] *Roberts v. Dretke*, 381 F.3d 491, 497 (5th Cir. 2004) (citation omitted) (citing *Pate*, 383 U.S. 375 (1966)).

[214] *Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. 2000).

33

been denied a fair trial."[215]  Austin asserts that the state trial court's failure to hold a standalone pretrial competency hearing denied him a fair trial.  He also contends that regardless of whether the state trial court's initial pretrial finding of competency was proper, the information about his mental health history presented at trial should have alerted the state trial court then to the possibility that Austin was not competent—in other words, the information created a bona fide doubt as to Austin's competency such that an additional hearing was necessary.

Because we conclude that Austin has failed to demonstrate by clear and convincing evidence that he was not competent to stand trial, waive counsel, or plead guilty, we similarly reject his procedural claim that the state trial court was required to hold a pretrial competency hearing and that because it did not, he was denied a fair trial.  In concluding that Austin could waive counsel and proceed pro se, the state trial court made an implicit finding that no bona fide doubt as to competency existed and that a standalone competency hearing was therefore not required.[216]  We presume that this factual finding is correct under § 2254(e)(1) and, as noted above, Austin has failed to overcome that presumption by clear and convincing evidence.  If we were to consider, in the alternative, the competency determination as a mixed question of law and fact subject to de novo review, rather than a purely factual finding, Austin has still failed to demonstrate he was not competent.  We therefore conclude that this procedural claim is without merit.

Nor is Austin entitled to relief based on his claim that the state trial court failed to inquire about Austin's competency adequately after hearing

---

[215] *Id.* (citing *Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997)).

[216] *See Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004).

evidence during Austin's trial about his past mental health issues that contradicted what Austin had told the court during earlier competency proceedings. To the extent that this procedural claim, not adjudicated on the merits by the state court, presents questions of law or mixed questions of law and fact, we review de novo.[217]

In response to several specific questions from the state trial judge during the pretrial hearing to consider Austin's request to proceed pro se, Austin stated that he had not had mental health issues in the past, and had not been treated nor received counseling for mental health issues. However, during trial, contrary evidence was adduced. Though this evidence clearly contradicted what Austin had previously told the state court, the trial court knew, prior to the pretrial hearing, that Austin had "a very bad problem with depression" and that Austin contemplated suicide often when depressed.[218] None of the evidence presented during Austin's capital murder trial undermines confidence in the state trial court's well-supported pretrial finding of competence, a finding based on Austin's demeanor, Dr. Brown's evaluation, the opinion of Austin's counsel, and the court's interactions with Austin, including correspondence from Austin indicating an ability to reason logically and strategically. As noted above, "[m]ental illness and incompetence . . . are not necessarily coexistent conditions."[219] The state trial court's failure to

---

[217] *See Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003).

[218] *See* CR at 16 (letter from Austin to the trial court before trial).

[219] *LaHood v. Davis*, 653 F. App'x 253, 263 (5th Cir. 2016) (citing *McCoy v. Lynaugh*, 874 F.2d 954, 960-61 (5th Cir. 1989); *United States v. Williams*, 819 F.2d 605, 608 (5th Cir. 1987)); *see also Drope v. Missouri*, 420 U.S. 162, 181 n.16 (1975) (recognizing that "a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion'" (quoting David F. Greenberg, *Involuntary Psychiatric Commitments to Prevent Suicide*, 49 N.Y.U. L. REV. 227, 236 (1974))).

No. 13-70024

conduct an additional hearing as to Austin's competency does not warrant habeas relief.

## C

Competence to plead guilty or to waive the right to counsel is measured by the same standard as competence to stand trial.[220] Nonetheless, "[a] finding that a defendant is competent to stand trial . . . is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel."[221] A trial court must also "satisfy itself that the [defendant's] waiver of his constitutional rights is knowing and voluntary."[222] Before granting a defendant's clear and unequivocal request to proceed pro se, the trial judge "must caution the defendant about the dangers of such a course of action so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"[223] To be voluntary, a plea must "not be the product of 'actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant.'"[224] A defendant pleading guilty must also be competent, have notice of the charges against him, understand the consequences of his plea, and have available the advice of competent counsel.[225] To the extent

---

[220] *Godinez v. Moran*, 509 U.S. 389, 398 (1993).

[221] *Id.* at 400.

[222] *Id.* at 400-01 ("In this sense there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*."); *see also Faretta v. California*, 422 U.S. 806, 807 (1975) (holding that the Sixth and Fourteenth amendments include the "right to proceed without counsel" when a criminal defendant "voluntarily and intelligently elects to do so").

[223] *United States v. Cano*, 519 F.3d 512, 516 (5th Cir. 2008) (quoting *United States v. Martin*, 790 F.2d 1215, 1218 (5th Cir. 1986)); *see also Faretta v. California*, 422 U.S. 806 (1975).

[224] *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000) (quoting *Brady v. United States*, 397 U.S. 742, 750 (1970)).

[225] *Id.*

No. 13-70024

Austin's claim involves subsidiary factual determinations made by the state trial court, we apply § 2254(e)(1)'s presumption of correctness, which Austin must rebut by clear and convincing evidence.[226] We review de novo questions of law and mixed questions of law and fact.[227]

Before accepting Austin's waiver of counsel, the state trial court confirmed that Austin knew and understood the charges against him, as well as the possible punishment if convicted.[228] The court informed Austin of his right to court-appointed counsel and explained the risks and disadvantages to proceeding pro se.[229] The court also inquired whether Austin's waiver of counsel was made voluntarily, intelligently, and knowingly.[230] During this exchange, Austin explained that he wanted to proceed pro se so that he would be able to make his own decisions about trial strategy.[231] A defendant has a "right to conduct his own defense," even though exercising that right "usually increases the likelihood of a trial outcome unfavorable to the defendant."[232] The right to self-representation "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty."[233] Although Austin may not have been trying to "protect his own liberty," he clearly expressed to the state trial court his wish to make his own decisions about trial strategy. An improper denial of Austin's

---

[226] *See Miller v. Fenton*, 474 U.S. 104, 112 (1985) (recognizing the presumption of correctness to subsidiary fact questions under the prior version of 28 U.S.C. § 2254(d)); *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998).

[227] *See Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003).

[228] 2RR9.

[229] 2RR9-12.

[230] 2RR12.

[231] 2RR13-14.

[232] *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)).

[233] *Id.*

right to self-representation by the state trial court would have amounted to structural error requiring reversal.[234]

Before accepting Austin's guilty plea, the state trial court again confirmed that Austin understood the charges against him and the possible punishment.[235]  It also admonished Austin that he had a right to a jury trial and asked Austin a series of questions to determine if his plea was voluntary.[236]  The court asked Austin if he was of sound mind.[237]  It explained the consequences of pleading guilty.[238]  The court specifically found, based on its prior evaluation of Austin's competency to stand trial at the first *Faretta* hearing as well as prior conversations with Austin, that Austin was "mentally competent to enter [a] plea of guilty" and that he was "doing so freely and voluntarily with full knowledge of the consequences."[239]

The requirements for a valid guilty plea and waiver of counsel are clearly met.  Austin contends that his mental illness and the conditions of his confinement rendered both his guilty plea and his waiver of trial counsel invalid because they were not knowing and voluntary.[240]  In light of our conclusion that the trial court's finding of competency was well-supported and correct even if reviewed de novo as a mixed question of law and fact, the evidence of depression or other mental illness does not render an otherwise

---

[234] *See id.*

[235] 9RR4.

[236] 9RR4-5 ("Has anyone reached any agreement with you to get you to enter your plea?"; "Has anybody promised you anything to get you to enter your plea?"; "Has anybody threatened you to get you to enter your plea?").

[237] 9RR5.

[238] *Id.*

[239] 9RR6.

[240] Austin Br. at 102.

effective waiver involuntary.[241]  Similarly, Austin has failed to demonstrate that the conditions of his confinement rendered his decisions involuntary or undermined his otherwise effective waiver.  Further, Austin's letter to the trial court approximately a month before the start of trial reflected he was no longer dissatisfied with the conditions of his confinement and no longer suffering from any depression.[242]  Even with the complained-of conditions removed, Austin indicated, consistent with his prior statements to the court, that he would not contest the charges against him.[243]

As previously noted, Austin has not presented clear and convincing evidence sufficient to overcome the state trial court's determination that he was competent to waive counsel and plead guilty.[244]  Our independent review confirms that Austin's plea and waiver of counsel were not the product of state coercion or otherwise rendered involuntary.

## V

Austin contends that his appointed trial counsel for the seven-month period before he was allowed to proceed pro se was ineffective for failing to undertake significant discovery or investigation into Austin's competency, and for failing to ask Austin more questions at the *Faretta* hearing (Issue 13).  The district court held that Austin could not show prejudice from counsel's

---

[241] *See Johnson v. United States*, 344 F.2d 401, 403-04 & n.4 (5th Cir. 1965) (separating the voluntariness inquiry from the mental competence inquiry and determining that because the trial judge had "carefully, thoroughly, and separately interrogated each of the defendants to ascertain whether the plea as to each separate indictment was freely, voluntarily, and understandably made" and had found that each plea was, "there is no suggestion, either in the records and papers or in the evidence on the 2255 proceeding, which even raises any question about this conclusion, either then or now").

[242] *See* CR at 58.

[243] *Id.*

[244] 28 U.S.C. § 2254(e)(1).

No. 13-70024

allegedly deficient performance because the evidence supported the state trial court's conclusion that Austin was competent.  We review the district court's conclusions of law and its conclusions of mixed law and fact de novo.[245]

Under the familiar test of *Strickland v. Washington*, a successful ineffective assistance of trial counsel claim requires a petitioner to show that (1) "counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense."[246]  Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[247]  In the context of mental health investigation, "[t]rial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems."[248]

Trial counsel in this case testified that he never doubted his client's competence,[249] and, though Austin points to the lack of investigation performed, he does not allege any facts that would have alerted counsel to the need to investigate Austin's competency.  As we have stated before, suicidality and depression are not necessarily indications of incompetence.  Additionally, a mental health evaluation was conducted prior to the *Faretta* hearing, which determined Austin to be competent.

Even if Austin had shown counsel's failure to investigate to be deficient performance under *Strickland*, Austin has wholly failed to support his

---

[245] *Jones v. Cain*, 227 F.3d 228, 230 (5th Cir. 2000).

[246] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[247] *Id.* at 691.

[248] *Roberts v. Dretke*, 381 F.3d 491, 498 (5th Cir. 2004).

[249] 2RR4.

No. 13-70024

allegation that counsel's performance prejudiced his defense.[250] *Strickland* requires Austin to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[251] Austin is correct that he need only show "a probability sufficient to undermine confidence in the outcome."[252] However, he has failed to do so. His briefing claims that had the district court correctly applied this standard, he would be entitled to relief.

We agree with the district court that the evidence presented both to the state trial court and in post-conviction proceedings strongly supports the state trial court's determination that Austin was competent. The fact that Austin sought the death penalty is not, in and of itself, sufficient to call into serious doubt his competence to proceed to trial in light of the other evidence before the court. His letters and colloquy with the judge do not suggest an inability to understand the proceedings or charges against him. To the contrary, Austin remained articulate and focused in his aim of representing himself and refusing to present a defense.[253] The court-ordered independent evaluation further supports the state trial court's conclusion that Austin was, in fact, competent to represent himself at trial.[254] Finally, though Austin details various psychiatric treatments, interactions with mental health professionals, and the opinions of experts hired post-conviction, nothing suggests he suffered any impairment that would bear on his competency to stand trial.[255] Even if

---

[250] *Bell v. Cone*, 535 U.S. 685, 695 (2002) ("Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand.").

[251] *Strickland*, 466 U.S. at 694.

[252] *Id.*

[253] ROA.645-47.

[254] ROA.648.

[255] *See* ROA.652-54.

41

the affidavits Austin submitted from medical professionals may be considered on federal habeas review since they were not presented to the state courts, an issue we pretermit because we are denying relief on the merits with respect to this issue, this evidence does not alter our conclusion.  Based on our review of the record, Austin's assertion that a more thorough investigation would have cast the competency proceedings in such a different light as to undermine confidence in their outcome is unpersuasive.

## VI

Austin contends that he did not receive a fair trial because five jurors gave false or misleading answers during *voir dire*, indicating that they could consider mitigating evidence and vote for a life sentence when in fact, they were pre-disposed to imposing the death penalty (Issue 19).  He relies on statements from those jurors obtained during the post-conviction investigation.

## A

"A juror is biased if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[256]  Austin relies upon *McDonough Power Equipment, Inc. v. Greenwood*, in which the Supreme Court observed that "[o]ne touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'"[257]  The *McDonough Power Equipment* case concerned a direct appeal in a civil, personal injury suit in which the jury found

---

[256] *Hatten v. Quarterman*, 570 F.3d 595, 600 (5th Cir. 2009) (quoting *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000)).

[257] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

in favor of the defendant.[258]  The losing plaintiff contended that a new trial was required because a juror failed to disclose during *voir dire* that his son had sustained a broken leg as a result of the explosion of a truck tire.[259]  The Supreme Court reasoned that "[t]o invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give."[260]  The Court then said, "[w]e hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause."[261]  The Fifth Circuit has assumed, without deciding, "that a *McDonough* theory of juror bias would be sufficient to obtain federal habeas relief,"[262] and we will do the same in the present case.

It is well-settled that a juror who will automatically vote for the death penalty is challengeable for cause.[263]  Austin contends that none of the jurors indicated during *voir dire* that he or she would automatically vote for the death penalty or refuse to consider mitigating evidence and therefore that there was no reason to challenge any juror for cause.[264]  Austin asserts that his entitlement to habeas relief can be determined from the transcript of *voir dire* when compared to post-trial statements from five jurors made approximately two years after trial.  Austin does not contend that the trial court erred in

---

[258] *Id.* at 549-50.

[259] *Id.* at 550-51.

[260] *Id.* at 555.

[261] *Id.* at 556.

[262] *Montoya v. Scott*, 65 F.3d 405, 419 (5th Cir. 1995).

[263] *See, e.g.*, *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

[264] Austin Br. at 109-10.

No. 13-70024

failing to hold an evidentiary hearing.[265]  We will therefore consider only the *voir dire* transcript and the post-trial statements.

Austin asserts that the jurors' post-trial statements establish that they misled the trial court during *voir dire* because the jurors confirmed to the court that they could consider mitigating evidence, when in fact they would not and were thus unqualified to serve.[266]  The federal district court did not consider whether Austin's evidence supported a claim of "actual prejudice,"[267] nor whether Austin was required to rebut, or had rebutted, by clear and convincing evidence,[268] any implied finding by the state trial court that the jurors were unbiased.  Nor did the district court consider whether the jurors' allegedly misleading answers were due to inadequate questioning on *voir dire*, or were a deliberate attempt to mislead the court.[269]

Because of our disposition of the jury bias claim, we will assume, without deciding, that the state trial court made no express or implied findings that the jurors were competent and unbiased.  We will further assume, without deciding, that there are no factual issues decided by the state courts to which AEDPA deference is due under 28 U.S.C. § 2254(e)(1).

---

[265] Oral Argument at 25:40 (July 12, 2017).

[266] ROA.108-09; Austin Reply Br. at 60.

[267] *See Gomez v. United States*, 245 F.2d 344 (5th Cir. 1957) (suggesting waivers of challenges to jurors premised on "actual prejudice" or "fundamental incompetence" differ from challenges based only on statutory disqualification).

[268] *See* 28 U.S.C. §2254(e); *Virgil v. Dretke*, 446 F.3d 598, 610 n.52 (5th Cir. 2006).

[269] *See United States v. Scott*, 854 F.2d 697, 700 n.12 (5th Cir. 1988) (comparing cases of deliberate or unreasonable omissions to cases involving inadequate or unspecific questioning).

No. 13-70024

## B

Austin's brief in our court focuses primarily upon William Gibbs, one of the five jurors that Austin contends was biased. Gibbs's *voir dire* contained the following exchanges:

> THE COURT: And if the evidence called for it, [could you] answer [the special issues] in such a way that you know a life sentence would result?
>
> GIBBS: Yes.
>
> THE COURT: I take it, then – and correct me if I'm wrong – that you would be guided by the evidence, listen to all of the evidence and answer the questions according to the evidence, wherever that might take you?
>
> GIBBS: Yes.
>
> . . .
>
> PROSECUTION: . . . Tell us first in your own words, what are your feelings on the death penalty?
>
> GIBBS: I am for it and - - I'm for it. I think it's necessary for a crime deterrent, and that's about it.
>
> . . .
>
> PROSECUTION: . . . Okay. Can you consider, then, in your mind that [the first special issue], depending on the evidence, could be answered either yes or no?
>
> GIBBS: Yes.
>
> . . .
>
> PROSECUTION: Can you consider that in Issue No. 2 that it could be answered in a yes or no fashion?
>
> GIBBS: Yes.
>
> . . .
>
> PROSECUTION: . . . Do you feel that you can participate in that - - the deliberations, deliberating with the jury and assess the death penalty if the law and the evidence supports it?
>
> GIBBS: Yes.
>
> . . .
>
> PROSECUTION: . . . are you saying that if you know that the defendant is representing himself and you know that he has a death wish, if the law and the evidence supports assessing the death penalty, are you saying you still could not assess the death penalty?

45

No. 13-70024

THE COURT: In other words, if the evidence called for answering those questions in such a way that you answered the first one yes and the second one no, you know the death penalty would result?

GIBBS: Yes.

THE COURT: Would the fact that you feel that you would be giving a defendant something that he wanted cause you in any way to change your answers based on the evidence?

GIBBS: No.

THE COURT: So, then, would you - - would you, I guess, honor your oath as a juror and base your verdict to those questions on the evidence; and if that's what the evidence proved to you, you would answer them in that way?

GIBBS: Yes.

THE COURT: Even if you feel like it's kind of unfair to give him what he would want?

GIBBS: Exactly.  That's just the way that I feel.  That's not the way that - - if that's what the law states, then that's how, I guess, I would have to vote.  But I mean - -

THE COURT: Your personal opinion - -

GIBBS: Personal feelings, I would have to say no; but I would say I would vote the death penalty if that's what the law stated and - -

THE COURT: And the evidence showed?

GIBBS: Yes.[270]

In his post-trial statement, Juror Gibbs made the following assertions:

I believe that 'an eye for an eye' is correct.  If you kill someone you should face the death penalty.

Once someone is guilty of capital murder I believe that the only appropriate penalty is the death penalty.  I do not think that there is anything that would be mitigating so that a person should not get the death penalty, this includes the person being insane.

Once I heard that Perry Austin had admitted to intentionally killing a nine year old boy I was only going to vote one way—I was going to vote 'yes' he was a future danger and 'no'

---

[270] 5RR32-33, 38-40, 43-44.

46

there was nothing mitigating. I was not going to vote for anything other than the death penalty.[271]

The *voir dire* and post-trial statements of the other four jurors are set forth in section VI(C) below. As noted, Austin relies only on the post-trial statements to support his contention that each of these jurors was dishonest in answering questions posed during *voir dire*. We conclude that the district court was foreclosed from considering any of the jurors' post-trial statements by Federal Rule of Evidence 606(b)(1) and the Supreme Court's decisions applying that Rule. Therefore, the district court did not err in failing to grant habeas relief on Austin's juror bias claim.

Rule 606(b)(1) provides:

> (b) During an Inquiry Into the Validity of a Verdict or Indictment.
>
> (1) Prohibited Testimony or Other Evidence. During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.[272]

The text of the rule is clear, and it explicitly directs that "a juror may not testify about . . . the effect of anything on that juror's . . . vote . . . or any juror's mental processes concerning the verdict or indictment." The Rule further provides, "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Each of the post-trial statements by jurors comes within these prohibitions.

---

[271] Pet. Ex. 65 at 007525-007526.
[272] FED. R. EVID. 606(b)(1).

No. 13-70024

The Supreme Court squarely held in *Warger v. Shauers* that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*."[273]   The Court rejected the argument that the inquiry under *McDonough* "begins and ends with what happened during voir dire," and therefore that Rule 606(b) should be inapplicable.[274]  The Court reasoned that "[w]hether or not a juror's alleged misconduct during voir dire had a direct effect on the jury's verdict, the motion for a new trial requires a court to determine whether the verdict can stand."[275] The Court further explained:

> [A] party's right to an impartial jury remains protected despite Rule 606(b)'s removal of one means of ensuring that jurors are unbiased.  Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered.[276]

The Ninth Circuit has similarly applied Rule 606(b) in a direct criminal appeal in which a juror's post-trial affidavit averred that other jurors had discussed the evidence against the defendant "and made up their minds about his guilt before the start of deliberations."[277]   In denying relief, the court explained that "[t]he notion that egregious juror conduct will not necessarily result in relief from the verdict may seem antithetical to our system of due

---

[273] *Warger v. Shauers*, 135 S. Ct. 521, 525 (2014).

[274] *Id.* at 528 (quoting a party's brief).

[275] *Id.*

[276] *Id.* at 529; *see also Tanner v. United States*, 483 U.S. 107, 127 (1987) (explaining that "[t]he suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*," and "after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct").

[277] *United States v. Leung*, 796 F.3d 1032, 1034 (9th Cir. 2015).

process."[278] But the Ninth Circuit discerned that "[t]he Rule . . . exists for good reason—it protects jurors from harassment and maintains the integrity and finality of jury verdicts."[279] The court observed, "[w]hile persistent inquiry into internal jury processes could 'in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior,' our very system of trial by jury might not 'survive such efforts to perfect it.'"[280]

The only exception that the Supreme Court has made to Rule 606(b)(1)'s prohibitions is "when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict."[281] The Court reasoned in *Pena-Rodriguez v. Colorado* that "[a]ll forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution."[282] The Court concluded that "[a] constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right."[283] There is no suggestion or indication of racial animus or bias in the present

---

[278] *Id.* at 1036.

[279] *Id.*

[280] *Id.* (quoting *Tanner*, 483 U.S. at 120); *see also United States v. Davis*, 960 F.2d 820, 828 (9th Cir. 1992) (rejecting a defendant's argument in a direct criminal appeal "that his sixth amendment right to an impartial jury was violated because one juror stated during a post-trial interview that, '[f]rom the first day I knew [Davis] was guilty,'" reasoning that "[t]he juror's statement reflects his personal feelings and beliefs concerning Davis" and that "[t]he statement is insufficient to set aside a verdict").

[281] *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 861 (2017).

[282] *Id.* at 869.

[283] *Id.*

case, and the Supreme Court has not recognized an exception to Rule 606(b) that would apply to the post-trial statements at issue here.

In our prior, unpublished opinion in this case granting a COA to Austin on his jury bias claim, we reasoned:

> [P]ost-trial interviews concern the honesty of statements made by the jurors during voir dire—not statements made during deliberations, the effect of something on the jurors' votes, or the jurors' mental processes concerning the verdict. Rule 606(b) does not bar admission of post-trial statements to prove that the jurors failed to answer a material question honestly during voir dire.[284]

That analysis was clearly incorrect in light of the Supreme Court's decision and reasoning in *Warger v. Shauers*, and, after full briefing and plenary consideration, we now disavow our prior reasoning and our discussion of Rule 606(b) in granting a COA on Austin's jury bias claim. Though we cited *Warger* in a footnote, our analysis of that decision was not in-depth and was inaccurate.[285]

This court's decision in *Hatten v. Quarterman*,[286] which we also cited in a footnote in our opinion and order granting a COA on Austin's jury bias claim,[287] involved unusual circumstances and does not support Austin's contention that the post-trial statements at issue are admissible to impeach the jury's verdict and require a new trial. In *Hatten*, questions as to whether a juror had been truthful during *voir dire* and was biased were raised in the midst of trial, before the case was submitted to the jury.[288] The juror in

---

[284] *Austin v. Davis*, 647 F. App'x 477, 493 (5th Cir. 2016) (per curiam).

[285] *Id.* at 493 n.63.

[286] 570 F.3d 595 (5th Cir. 2009).

[287] *Austin*, 647 F. App'x at 493 n.63.

[288] *Hatten*, 570 F.3d at 600-02.

question testified during a hearing that was held to ascertain whether he had lied on his juror questionnaire about whether he had a "drug problem," among other issues.[289] Though this court discussed the juror's post-trial affidavit, in which he stated that that "he did, in fact, have a drug problem at the time of the trial and that his drug use affected his judgment,"[290] we concluded that his response to the jury questionnaire had been ambiguous.[291] Importantly to the issue now before us, we concluded that even if the affidavit called into question the juror's truthfulness in responding to the questionnaire, the juror had actually testified at the hearing during trial about his questionnaire response, the district court had concluded that the juror's post-trial affidavit should not be credited over that testimony, and we found no basis for overturning the district court's factual finding in this regard.[292] The salient point is that in *Hatten*, there was no actual holding by this court that a post-trial affidavit could or did impeach a verdict. Only an implication can be drawn from *Hatten* that if a post-trial affidavit demonstrated a juror's bias, the affidavit could be used to impeach the verdict and a new trial would be necessary. An implication is not a holding. In any event, to the extent that it could be argued that *Hatten* contained such a holding, *Hatten* is inconsistent with the Supreme Court's

---

[289] *Id.*; *see also id.* at 600 (reflecting that the claims in the subsequent federal habeas proceeding were that "Hatten [the defendant] complains that Hollins's [the juror's] bias is reflected by the facts that: (a) Hollins lied on his juror questionnaire and during his questioning regarding his drug use; (b) Hollins concealed the scope of his relationship with Isaac Robinson, the victim's father, and with Hatten's [the defendant's] stepfather; and (c) Hollins [the juror] was threatened with prosecution during trial and consequently must have favored the prosecution").

[290] *Id.* at 602.

[291] *Id.*

[292] *See id.*

No. 13-70024

subsequent decision in *Warger* and the Supreme Court's explication of *Warger* and *Tanner* in *Pena-Rodriguez*.[293]

The post-trial statements of the five jurors are inadmissible by virtue of Rule 606(b). Austin has no other evidence that any of these jurors were less than candid during *voir dire*. Austin's jury bias claim therefore fails.

## C

As an alternative basis for affirming the district court's judgment with respect to Austin's juror bias claim, we conclude that even were the jurors' post-trial statements admissible, Austin has not demonstrated that a juror "failed to answer honestly a material question on *voir dire*," and "that a correct response would have provided a valid basis for a challenge for cause."[294]

Two special issues were to be submitted to the jury, and potential jurors were questioned about these issues during *voir dire*. The first special issue was "[d]o you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Perry Allen Austin, would commit criminal acts of violence that would constitute a continuing threat to society."[295] The second special issue was "[d]o you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Perry Allen Austin, that there is a sufficient mitigating

---

[293] *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 865-67 (2017) (observing that "since the enactment of Rule 606(b), the Court has addressed the precise question whether the Constitution mandates an exception to it in just two instances" and noting that the Sixth Amendment did not require an exception in either instance) (citing *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) and *Tanner v. United States*, 483 U.S. 107, 125 (1987)).

[294] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

[295] Pet. Ex. 36 at 001611; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(b)(1) (West Supp. 2002).

## No. 13-70024

circumstance or circumstances to warrant that a life imprisonment rather than a death sentence be imposed."[296]

Before we consider each of the five jurors' specific *voir dire* and post-trial statements, we note that none of these jurors was asked if he or she could consider a specific type of mitigation evidence or categories of mitigation evidence. They were only asked whether they could potentially answer the special issues so as to impose a life sentence if the law and evidence so required. We also note that the record reflects that the murder victim's age, nine years old, was not revealed to the jurors until the punishment phase commenced, which was after *voir dire* had been completed.[297]

*Juror Erwin*

The relevant portion of Juror Erwin's *voir dire* consisted of the following exchanges:

> THE COURT: And if the evidence called for it, [could you] answer [the special issue] in such a way that you know a life sentence would result?
> ERWIN: Yes.
> THE COURT: I take it, then, sir, that you would listen to the evidence, follow the law and be guided by the evidence and the law, wherever that might take you in this trial?
> ERWIN: Whatever that is, yes.
> . . .
> ERWIN: There's a few cases I think you should get the death penalty, but that's just me.
> PROSECUTION: Okay, and that would be what? What cases would those be?
> ERWIN: Anything had to do with hurting the elderly - -
> PROSECUTION: Okay.
> ERWIN: - - or kids.

---

[296] Pet. Ex. 36 at 001612; *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(1) (West Supp. 2002).
[297] 9RR17.

No. 13-70024

> PROSECUTION: Children?
> ERWIN: Children
> . . .
> PROSECUTOR: Okay. Can you see how Special Issue No. 2 can be answered either yes or no depending on what evidence you hear in the courtroom?
> ERWIN: Yes.[298]

Erwin's post-trial statement included the following:

> I believe that if you are found guilty of capital murder the only appropriate penalty is the death penalty. The only thing that would make that different is if the person was insane.
> After Perry Austin admitted he did the murder the case was pretty simple. He wanted the death penalty and we were happy to give it to him.[299]

The first paragraph of the post-trial statement reflects Erwin's beliefs as of the date of the statement. It does not say that Erwin held these beliefs at the time of *voir dire*. Two years after a trial, a juror's beliefs may have changed, particularly after participating in a capital trial and voting to impose a death sentence. But even if Erwin thought during *voir dire* that the only circumstance warranting a life sentence as opposed to a death sentence would be insanity when the crime was committed, his responses to the questions he was asked during *voir dire* are consistent with that view. He was not asked to identify what factors would cause him to vote in favor of a life sentence. He was only asked if there were circumstances in which he could vote for a life sentence, and his post-trial statement confirms that there was at least one such circumstance.

---

[298] 4RR18-31.
[299] Pet. Ex. 68 at 007541-007542.

No. 13-70024

The second paragraph of the post-trial statement does not contradict anything that Erwin said in response to questions during *voir dire*. Nothing in the second paragraph is an assertion that the evidence called for a life sentence but that Erwin ignored that evidence. Erwin was not required to vote for a life sentence simply because there was mitigating evidence. Austin admitted to murdering a child, and during his pro se closing statement, Austin himself set forth facts that he said supported answering the two special issues in a way that would result in a death sentence. Erwin's brief characterization in his post-trial statement of why the jury voted as it did does not contradict anything that Erwin said during *voir dire*. In fact, Erwin candidly revealed during *voir dire* that he thought that someone who killed an elderly person or a child should receive the death penalty. We do not consider whether there may have been cause to strike Erwin based on his *voir dire* testimony or his post-trial statement because Austin has not met the first prong of *McDonough*, that Erwin was dishonest during *voir dire*. There is no evidence of dishonesty.

*Juror Condon*

Juror Condon's *voir dire* contained the following relevant exchanges:

THE COURT: And if the evidence called for it, [could you] answer [the special issues] in such a way that you know a life sentence would result?

CONDON: Yes.

THE COURT: All right. I take it, Mr. Condon, your feelings are that you would listen to everything, be guided by the evidence and the law, wherever that might take you?

CONDON: Yes.

. . .

PROSECUTION: . . . Can you tell us in your own words what your feelings are on the death penalty?

CONDON: Well, I feel that in certain cases it's justifiable punishment for - - never been asked to put it in words, I guess. If

55

No. 13-70024

someone commits a premeditated act of violence against someone else, I think it's justifiable they be repaid in kind.

. . .

PROSECUTION: . . . Could you participate in the jury deliberations and assessing the death penalty if the evidence and the law directs you to?

CONDON: Yes.

. . .

PROSECUTION: Okay. Do you understand - - can you perceive that [the second special] issue could be answered either yes or no as well?

CONDON: Yes.

. . .

PROSECUTION: . . . Let's say you were king of the world. If you were the king, would your kingdom have a death penalty?

CONDON: Yes.

PROSECUTION: And why?

CONDON: I just feel that certain crimes deserve the ultimate punishment, I guess.[300]

In his post-conviction statement, Condon made the following assertions:

For me, if somebody is not insane and kills somebody, especially a child, the only appropriate penalty is the death penalty. Other than showing that it was an accident or the person was insane I do not think that any other considerations are relevant. If you are found guilty of capital murder you should get the death penalty.

. . .

When I was asked at the time the jury was selected whether I could consider voting for life I said yes and I was thinking about a situation where someone was insane and did not know what they were doing.[301]

---

[300] 5RR5-17.
[301] Pet. Ex. 67 at 007533-007534, 007537-007538.

The first paragraph of the post-trial statement reflects Condon's views as of the date of the statement. It does not say that Condon held these view during *voir dire*. But even if he held those views during *voir dire*, nothing in the first paragraph or the second paragraph contradicts Condon's *voir dire* testimony. When asked to "tell us in your own words what your feelings are on the death penalty," Condon responded, "[i]f someone commits a premeditated act of violence against someone else, I think it's justifiable they be repaid in kind." That is a categorical statement. It is entirely consistent with both the first and second paragraphs of Condon's post-trial statement, as is Condon's statement during *voir dire* that "I just feel that certain crimes deserve the ultimate punishment." Condon was not asked during *voir dire* whether the only circumstance that would cause him to vote for a life sentence would be the insanity of the defendant. Austin has not established the first requirement of *McDonough*, which is that Condon failed to answer honestly a material question.

*Juror Gibbs*

Gibbs's *voir dire* contained the following exchanges:

> THE COURT: And if the evidence called for it, [could you] answer [the special issues] in such a way that you know a life sentence would result?
> GIBBS: Yes.
> THE COURT: I take it, then – and correct me if I'm wrong – that you would be guided by the evidence, listen to all of the evidence and answer the questions according to the evidence, wherever that might take you?
> GIBBS: Yes.
> . . .
> PROSECUTION: . . . Tell us first in your own words, what are your feelings on the death penalty?
> GIBBS: I am for it and - - I'm for it. I think it's necessary for a crime deterrent, and that's about it.

No. 13-70024

. . .

PROSECUTION: . . . Okay. Can you consider, then, in your mind that [the first special issue], depending on the evidence, could be answered either yes or no?

GIBBS: Yes.

. . .

PROSECUTION: Can you consider that in Issue No. 2 that it could be answered in a yes or no fashion?

GIBBS: Yes.

. . .

PROSECUTION: . . . Do you feel that you can participate in that - - the deliberations, deliberating with the jury and assess the death penalty if the law and the evidence supports it?

GIBBS: Yes.

. . .

PROSECUTION: . . . are you saying that if you know that the defendant is representing himself and you know that he has a death wish, if the law and the evidence supports assessing the death penalty, are you saying you still could not assess the death penalty?

THE COURT: In other words, if the evidence called for answering those questions in such a way that you answered the first one yes and the second one no, you know the death penalty would result?

GIBBS: Yes.

THE COURT: Would the fact that you feel that you would be giving a defendant something that he wanted cause you in any way to change your answers based on the evidence?

GIBBS: No.

THE COURT: So, then, would you - - would you, I guess, honor your oath as a juror and base your verdict to those questions on the evidence; and if that's what the evidence proved to you, you would answer them in that way?

GIBBS: Yes.

THE COURT: Even if you feel like it's kind of unfair to give him what he would want?

GIBBS: Exactly. That's just the way that I feel. That's not the way that - - if that's what the law states, then that's how, I guess, I would have to vote. But I mean - -

THE COURT: Your personal opinion - -

58

No. 13-70024

GIBBS: Personal feelings, I would have to say no; but I would say I would vote the death penalty if that's what the law stated and - -

THE COURT: And the evidence showed?

GIBBS: Yes.[302]

In his post-trial statement, Juror Gibbs made the following assertions:

I believe that 'an eye for an eye' is correct.  If you kill someone you should face the death penalty.

Once someone is guilty of capital murder I believe that the only appropriate penalty is the death penalty.  I do not think that there is anything that would be mitigating so that a person should not get the death penalty, this includes the person being insane.

Once I heard that Perry Austin had admitted to intentionally killing a nine year old boy I was only going to vote one way—I was going to vote 'yes' he was a future danger and 'no' there was nothing mitigating.  I was not going to vote for anything other than the death penalty.[303]

The first two paragraphs reflect Gibbs' belief as of the date of his statement.  They are not evidence that he held these views during *voir dire*.  The third paragraph reflects Gibbs' weighing of all the evidence.  As discussed above, there is no evidence that before or during *voir dire*, Gibbs had "heard that Perry Austin had admitted to intentionally killing a nine year old boy." The record reflects that D.K.'s age was not in evidence until after *voir dire*.[304] When the facts were presented during trial, Austin gave the fact that Austin intentionally killed a nine-year-old child controlling weight.  He did not say he would do otherwise in his *voir dire* testimony.

*Juror Tamayo*

---

[302] 5RR32-33, 38-40, 43-44.

[303] Pet. Ex. 65 at 007525-007526.

[304] 9RR17.

No. 13-70024

The relevant portions of juror Tamayo's *voir dire* are as follows:

THE COURT: And I guess the other part of that would be if the evidence called for it, could you answer [the special issues] in such a way that a life sentence would result?

TAMAYO: Yeah.

THE COURT: So I guess my question is can you assure us that you would be guided by the evidence and the law and answer those questions accordingly, regardless of which result it might be?

TAMAYO: Yeah.

THE COURT: Yeah?

TAMAYO: Yes.

. . .

PROSECUTION: Well, why don't you tell me in your own words what you think of the death penalty and what purpose do you think it serves?

TAMAYO: Well, I think it's working. I'm for it.

. . .

PROSECUTION: . . . You may hear something that's sufficient enough for you that you think even though he's a capital murderer and he's probably going to be dangerous, he ought to receive life instead of death. Okay. Does that question make sense to you?

TAMAYO: It does.

. . .

PROSECUTION: If you were the king and it's your kingdom and you get to write the laws, would your kingdom have a death penalty?

TAMAYO: Well, yeah. I think, yeah, it would.

PROSECUTION: Why?

TAMAYO: Because if, you know, the evidence proves that he's going to keep, you know, having - - making trouble and stuff, well, then get rid of him, forget it.

. . .

PROSECUTION: . . . Hypothetically, let's assume during the course of the trial, if you're selected to sit on the jury, you find out not only that he's representing himself but that he has a death wish. He's not asking any questions. He just sits there, and he wants y'all to give him the death penalty. How does that make you feel?

60

No. 13-70024

TAMAYO: Well, it's not whether he wants it or not. It's just whether it's given to him or not.
PROSECUTION: Based on the law and evidence?
TAMAYO: Right.[305]

Juror Tamayo's post-trial statement contained the following:

The death penalty is especially appropriate for child killers. I do not consider mental illness to be mitigation because it is too easy for defendants to lie and manipulate circumstances.[306]

Tamayo's post-trial statement does not say that he held these views during *voir dire.* The statement reflects his beliefs two years after trial. In any event, the statement expresses the weight that Tamayo would give to two factors. His belief that the death penalty is especially appropriate for child killers and that he does not consider mental illness to be mitigating is simply how he weighs such evidence. He does not consider mental illness to be "a sufficient mitigating circumstance," and the special issue asked only if there is "a sufficient mitigating circumstance or circumstances." If Austin's position were correct, a prospective juror would be required to confirm during *voir dire* that he or she would vote for a life sentence if there were evidence of mental illness, at least in some circumstances. Neither the law nor the issues put to Austin's jury requires this. The Supreme Court has long recognized that evidence of mental illness is a two-edged sword when a jury is deciding whether a death sentence is appropriate.[307]

*Juror Finnegan*

Juror Finnegan's *voir dire* proceeded, in relevant part, as follows:

---

[305] 5RR46-60.

[306] Pet. Ex. 85 at 007645.

[307] *See Brewer v. Quarterman,* 550 U.S. 286, 292-93 (2007) ("As did Penry's, Brewer's mitigating evidence served as a 'two-edged sword' because it tended to confirm the State's evidence of future dangerousness as well as lessen his culpability for the crime.").

No. 13-70024

THE COURT: And, on the other hand, if the evidence called for it, [could you] answer [the special issues] in such a way that a life sentence would result?

FINNEGAN: Absolutely.

THE COURT: All right.  So then I take it, Mr. Finnegan, what you're telling us is that you would listen to all of the evidence, follow the law and answer those questions according to the law and the evidence, wherever that might lead you?

FINNEGAN: Absolutely.

. . .

PROSECUTION: Okay.  Is there anything about your experience working with the F.B.I. or having been a police officer for as many years as you had that would affect your ability to be a juror in a criminal case?

FINNEGAN: I'd say no.

PROSECUTION: Okay.  Anything about your experience in law enforcement dealing with defense attorneys or prosecutors that would affect your ability to be a juror in a criminal case?

FINNEGAN: No.  Purely professional.

PROSECUTION: Okay.  All right.  Now, why don't you tell me, Mr. Finnegan, if you will, what your feelings are about the death penalty and what purpose do you think it serves in our society?

FINNEGAN: Feelings?

PROSECUTION: Yes, sir.

FINNEGAN: First, it's a necessary evil - -

PROSECUTION: Okay.

FINNEGAN: - - I would say.  And the reason being is that I'm a - - what right do I have to take another life?  However, along those same lines, there are certain crimes which I consider heinous crimes which I think the person, if he or she has absolutely no remorse and possesses [sic] a continuing threat, I could absolutely be in favor of.

PROSECUTION: . . . [W]hen you say "heinous crimes," what types of offenses came to your mind where you thought the death penalty might be appropriate?

FINNEGAN: Violent crimes against a child.

PROSECUTION: Okay.

## No. 13-70024

FINNEGAN: That would be, you know - - and purely innocent type of victim without any defense, something along those lines. That's what first issue came to my mind.

. . .

PROSECUTION: Can you see how special issue No. 2 can be answered yes or no just depending on what you hear in the courtroom?

FINNEGAN: I do.[308]

In his post-trial statement, Juror Finnegan made the following assertions:

I believe that once Austin was found guilty of the murder of the victim the only appropriate sentence was death in accordance with Texas law. I believe that the prosecutors chose me to be on Austin's jury because Perry wanted to die and Perry knew that with me working in law enforcement I would sentence him to death. Perry allowed me to stay on his jury.[309]

Nothing in Finnegan's post-trial statement indicates that he was dishonest in responding to questions during *voir dire*. Finnegan's statement refers to "the victim," not murder victims generically. Finnegan did not say that he would automatically vote for the death penalty in every case.[310] The victim in this case was a nine-year-old boy. For the reasons discussed above, Finnegan's post-trial statement is evidence of the weight that he gave to the nature of the crime, not evidence that Finnegan failed to respond truthfully to inquiries during *voir dire*.

None of the post-trial statements establish that a juror answered a question dishonestly during *voir dire*.

---

[308] 5RR66-83.

[309] Pet. Ex. 94 at 007738-007739.

[310] *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992) ("A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.").

No. 13-70024

## VII

Austin contends that the district court erred in denying his request for an evidentiary hearing (Issue 1).  Section 2254(e)(2) controls whether a habeas petitioner may receive an evidentiary hearing in federal district court on the claims for which the applicant failed to develop the factual basis in state courts.[311]  It "constrains the discretion of district courts to grant evidentiary hearings," even "[w]here section 2254(d) does not apply."[312]  The phrase "failed to develop" means a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."[313]

The parties dispute whether Austin was diligent in pursuing his competency claims, such that § 2254(e)(2) does not apply.  We need not resolve the issue with regard to Austin's incompetency claims.  "A district court may refuse an evidentiary hearing where there is not 'a factual dispute which, if resolved in [the prisoner's] favor, would entitle him to relief.'"[314]  We note that the district court granted Austin time and funding to investigate his claims,[315] and concluded that an evidentiary hearing was unnecessary to resolve the claims presented in his petition.[316]  Austin still fails to adduce evidence that creates a factual dispute that, if resolved in his favor, would entitle him to relief on his competency claim.  Austin's experts certainly opine that he

---

[311] *Williams v. Taylor*, 529 U.S. 420, 429 (2000); *Norman v. Stephens*, 817 F.3d 226, 234 (5th Cir. 2016).

[312] *Loden v. McCarty*, 778 F.3d 484, 494 (5th Cir. 2015); *see also Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011) ("At a minimum, . . . § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court.").

[313] *Norman*, 817 F.3d at 234 (quoting *Williams*, 529 U.S. at 432).

[314] *Id.* at 235 (quoting *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000)).

[315] ROA.1915; ROA.1924.

[316] ROA.2747-48; ROA.2766 (noting that the court would "call for an evidentiary hearing if it determines that one is necessary").

suffered from depression and suicidality. But, as previously discussed, mere presence of mental illness does not render a defendant incompetent. The district court did not abuse its discretion in denying an evidentiary hearing on the issue of competence.

With respect to the jury bias claim, it appears that Austin pursued an evidentiary hearing in the federal district court only on the issue of competence.[317] Austin now concedes that further factual development with regard to his juror bias claim is not necessary.[318] However, out of an abundance of caution, and to the extent he sought an evidentiary hearing in relation to his juror bias claims in his briefing in our court,[319] we address whether the district court erred in failing to conduct an evidentiary hearing regarding juror bias. We conclude that the district court did not abuse its discretion in denying an evidentiary hearing.

We can determine from the record that the post-trial juror statements at issue can be reconciled with each juror's statements during *voir dire*. Further factual development in an evidentiary hearing is not warranted. Austin does not identify another factual dispute regarding his juror bias claim which might independently require further factual development.

\* \* \*

For the foregoing reasons, we AFFIRM the district court's judgment denying relief on Austin's claims.

---

[317] ROA.2126-31 (motion for evidentiary hearing); ROA.2133 (exhibit list for Austin's motion showing exhibits appearing to relate only to Austin's mental health).

[318] Oral Argument at 25:40 (July 12, 2017).

[319] Austin Br. at 47 ("Another factual dispute requiring relief if decided in Petitioner's favor is whether jurors in the case were biased, in particular, whether the disqualifying bias they now express was present at the time of trial.").

No. 13-70024

PRISCILLA R. OWEN, Circuit Judge, concurring:

I write separately to provide additional reasons that habeas relief should be denied in this case.

## I

In *Pena–Rodriguez*, the Supreme Court observed that before Rule 606(b)'s adoption the Court had "noted the possibility of an exception to the [common-law no-impeachment rule] in the 'gravest and most important cases.'"[1] "Yet since the enactment of Rule 606(b)," the Court continued, it "has addressed the precise question whether the Constitution mandates an exception to [the common-law no-impeachment rule] in just two instances."[2] Those two instances were *Tanner*,[3] in which "the Court rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial,"[4] and *Warger*,[5] in which "[t]he Court again rejected the argument that, in the circumstances there, the jury trial right required an exception to the no-impeachment rule."[6]  The Court had noted in *Warger* that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged.  If and when such a case arises, the Court can consider whether the usual safeguards are or are not sufficient to protect the integrity of the process."[7]  Neither the Supreme Court

---

[1] *Pena–Rodriguez v. Colorado*, 137 S. Ct. 855, 865-66 (2017) (quoting *United States v. Reid*, 12 How. 361, 366, 13 L. Ed. 1023 (1852) and *McDonald v. Pless*, 238 U.S. 264, 269 (1915)).

[2] *Id.*

[3] *Tanner v. United States*, 483 U.S. 107 (1987).

[4] *Pena–Rodriguez*, 137 S. Ct. at 866 (citing *Tanner*, 483 U.S. at 125).

[5] *Warger v. Shauers*, 135 S. Ct. 521 (2014).

[6] *Pena–Rodriguez*, 137 S. Ct. at 866 (citing *Warger*, 135 S. Ct. at 529).

[7] *Warger*, 135 S. Ct. at 529 n.3.

No. 13-70024

nor this court has recognized an exception to Rule 606(b) in a case like the present one.

An exception to the no-impeachment rule should not be recognized here. Even assuming *arguendo* that one or more of the five jurors answered a material question dishonestly during *voir dire*, habeas relief remains unwarranted. The record amply supports, and in fact compels, the conclusion that Austin had resolved to accept all jurors that the State accepted and that if, during *voir dire*, the five jurors had expressed the views contained in their post-trial statements, Austin would not have challenged any of those jurors for cause, because Austin's trial strategy was to obtain the death penalty. Austin cannot now claim in a habeas proceeding that had he known the jurors' actual views, or had he known that they had predilections and a bias in favor of the death penalty, he would have challenged them for cause and thereby preserved the issue for appeal or collateral review. The record is clear that he would not have challenged any of the five jurors for cause during the trial even had there been a basis for doing so.

It is undisputed that when *voir dire* occurred, Austin intended to plead guilty, and after the jurors were seated, Austin entered a guilty plea in their presence. The jury was empaneled only to decide whether Austin would receive a life sentence or a death sentence. During closing arguments, Austin personally argued to the jury that, because of the nature of his crime and because of his past and future dangerousness, it should answer the two questions submitted in a way that would require imposition of the death penalty. The Supreme Court has never held that, consistent with a defendant's trial strategy, a defendant may knowingly accept a biased juror and then, after a change of heart in collateral proceedings, obtain automatic reversal because of that juror's bias.

67

No. 13-70024

To the contrary, the Supreme Court explained in *McDonough Power Equipment, Inc. v. Greenwood*, the primary case on which Austin relies, that "[i]t is not clear from the opinion of the Court of Appeals whether the information stated in Greenwood's affidavit was known to respondents or their counsel at the time of the *voir dire* examination."[8]  Importantly, the Court admonished that "[i]f it were, of course, [defendants] would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the potentially biased juror] further upon receiving an answer which they thought to be factually incorrect."[9]  The Supreme Court cited a decision from the Eighth Circuit in support of this conclusion,[10] which held that "'[t]he right to challenge the panel or to challenge a particular juror may be waived, and in fact is waived by failure to seasonably object.'"[11]  The Eighth Circuit explained that

> It is established that failure to object at the time the jury is empaneled operates as a conclusive waiver if the basis of the objection is known of [*sic*] might have been known or discovered through the exercise of reasonable diligence, or if the party is otherwise chargeable with knowledge of the ground of the objection.[12]

---

[8] *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 550 n.2 (1984).

[9] *Id.*

[10] *Id.* (citing *Johnson v. Hill*, 274 F.2d 110, 115-116 (8th Cir. 1960)).

[11] *Johnson*, 274 F.2d at 116 (quoting *Batsell v. United States*, 217 F.2d 257, 260 (8th Cir. 1954) (citing *Carruthers v. Reed*, 102 F.2d 933, 939 (8th Cir. 1939))).

[12] *Id.* (quoting *Batsell*, 217 F.2d at 260 (citing 50 C.J.S. Juries § 251)); *see also United States v. Pennington*, 168 F.3d 1060, 1067 (8th Cir. 1999) (holding in a direct criminal appeal that the defendant "waived this [juror bias] issue by not challenging the juror when the jury was empaneled because the basis for the objection was then known"). *But see Franklin v. Anderson*, 434 F.3d 412, 426-28 (6th Cir. 2006) (holding in a habeas proceeding that a juror "was biased because she could not understand the law," that "[t]here is no situation under which the impaneling of a biased juror can be excused," that "the State can [accordingly] make no argument that [the defendant's] trial counsel acted strategically in keeping [the

Similarly, the Eleventh Circuit has held that reversal of a verdict is inappropriate when a defendant permits a potentially or actually biased juror to be seated as part of trial strategy.[13]

The point of citing these authorities is twofold. First, Austin may well have elicited the same information that is contained in the jurors' post-trial statements had he questioned these jurors during *voir dire*.[14] Second, and more importantly, even had the jurors expressed during *voir dire* what they said in their post-trial statements, Austin would have had to have asserted a challenge for cause to have preserved a claim of juror bias for consideration on appeal or in a habeas proceeding. The record establishes that Austin would not have challenged them for cause.

Prior to trial Austin declared that he would accept every juror that the State accepted and that he would not exercise any peremptory challenges.[15] During *voir dire* at least two of the jurors that Austin now contends were biased made statements that should have at least prompted inquiry, if not challenges for cause, by Austin regarding bias or pre-judgment of the issues to be decided by the jury.

During the *voir dire* of Juror Erwin, the following exchange occurred:

> ERWIN: There's a few cases I think you should get the death penalty, but that's just me.

---

biased juror] on the panel" and that "[t]o permit this would be to allow trial counsel to waive the defendant's right to an impartial jury").

[13] *See generally United States v. Simmons*, 961 F.2d 183, 186 (11th Cir. 1992) (holding that a district court did not commit plain error by failing to excuse, *sua sponte*, certain jurors for cause, because defense counsel's failure to exercise two remaining peremptory strikes "may well have been a strategic decision to retain the four jurors in question").

[14] *See generally Robinson v. Monsanto Co.*, 758 F.2d 331, 335 (8th Cir. 1985) (holding in a civil case that "the right to challenge a juror is waived by failure to object at the time the jury is empaneled if the basis for objection might have been discovered during voir dire").

[15] *See generally* Reporter's Record vols. 3-8; CR at 20.

No. 13-70024

PROSECUTION: Okay, and that would be what? What cases would those be?

ERWIN: Anything had to do with hurting the elderly—

PROSECUTION: Okay.

ERWIN: —or kids.

PROSECUTION: Children?

ERWIN: Children.

Similarly, during the *voir dire* of Juror Finnegan, this exchange occurred:

PROSECUTION: Okay. All right. Now, why don't you tell me, Mr. Finnegan, if you will, what your feelings are about the death penalty and what purpose do you think it serves in our society?

FINNEGAN: Feelings?

PROSECUTION: Yes, sir.

FINNEGAN: First, it's a necessary evil—

PROSECUTION: Okay.

FINNEGAN: —I would say. And the reason being is that I'm a—what right do I have to take another life? However, along those same lines, there are certain crimes which I consider heinous crimes which I think the person, if he or she has absolutely no remorse and possesses [*sic*] a continuing threat, I could absolutely be in favor of.

PROSECUTION: [W]hen you say "heinous crimes," what types of offenses came to your mind where you thought the death penalty might be appropriate?

FINNEGAN: Violent crimes against a child.

PROSECUTION: Okay.

FINNEGAN: That would be, you know—and purely innocent type of victim without any defense, something along those lines. That's what first issue came to my mind.

Though Austin's sentence for the murder of a child would depend on the jury's findings in favor of either life or death, Austin remained silent throughout *voir dire*. He has offered no reason for failing to question Erwin or Finnegan as to the views they expressed during *voir dire* regarding the death

penalty when a child was the victim. He has not asserted in habeas proceedings that his counsel (himself) was ineffective for failing to question these jurors during *voir dire* or for failing to challenge them for cause. His only contention is that, if he had known during *voir dire* the substance of the five jurors' post-trial statements, he would have had grounds to challenge each of them for cause. If grounds to remove them for cause did exist, and had those grounds been revealed during *voir dire*, then it would have been incumbent upon Austin actually to raise challenges for cause. Otherwise, as the Eighth Circuit cogently explained, "'[i]f a defendant is allowed to . . . forego challenges for-cause to a biased juror and then allowed to have the conviction reversed on appeal because of that juror's service, that would be equivalent to allowing the defendant to plant an error and grow a risk-free trial.'"[16]

It rings hollow for Austin now to contend that had he known the five jurors' views he would have challenged them for cause. Austin's actions, and more importantly inactions, in declining to ask any questions during *voir dire*, deciding before trial to accept all jurors the State accepted, and declining to exercise any preemptory challenges are entirely consistent with his trial strategy, which he set forth in letters to the trial court. Prior to trial, Austin advised the trial court that he was "still firm about [his] decision to not fight this case" and that "since [he was] not going to put up any type of defense," he had "decided that it [was] not necessary for [him] to review [his] case file."[17]

The Supreme Court has never held that juror bias is structural error requiring automatic reversal. In addition to its discussion in *McDonough*,[18]

---

[16] *United States v. Johnson*, 688 F.3d 494, 501-02 (8th Cir. 2012) (quoting *United States v. Brazelton*, 557 F.3d 750, 755 (7th Cir. 2009) (internal quotations marks and citations omitted)).

[17] CR at 58 (letter from Austin to the trial court dated Feb. 19, 2002).

[18] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 550 n.2 (1984).

the Supreme Court has indicated that when grounds for cause to challenge a juror are apparent, the defendant must properly preserve his right to challenge for cause.

In *Ross v. Oklahoma*, a defendant in a capital case moved to excuse a potential juror for cause because that member of the venire "declared that if the jury found [the defendant] guilty, he would vote to impose death automatically."[19]  When the trial court refused to excuse the potential juror for cause, the defendant exercised a peremptory challenge to prevent the seating of that individual on the jury.[20]  The Supreme Court's actual holding in *Ross* was that the trial court had erred in refusing to strike the person for cause, but the Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury" because "[w]e have long recognized that peremptory challenges are not of constitutional dimension."[21]  The Court concluded that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."[22]  The Court also said that "[i]t is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury,"[23] but the sentence following that statement contained qualifiers material to the inquiry presently before us.  The Court said, "[h]ad [the biased juror] sat on the jury that ultimately sentenced [the defendant] to death, and *had the petitioner properly preserved his right to challenge the trial*

---

[19] *Ross v. Oklahoma*, 487 U.S. 81, 83-84 (1988).
[20] *Id.* at 84.
[21] *Id.* at 88.
[22] *Id.*
[23] *Id.* at 85.

*court's failure to remove [the biased juror] for cause*, the sentence would have to be overturned."[24]   The prerequisite in the Court's analysis of when a sentence would have to be overturned was a challenge for cause that was denied by the trial court.

The Supreme Court also discussed in *Ross* the requirement of Oklahoma law "that a defendant who disagrees with the trial court's ruling on a for-cause challenge must, in order to preserve the claim that the ruling deprived him of a fair trial, exercise a peremptory challenge to remove the juror," and that "[e]ven then, the error is grounds for reversal only if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him."[25]

In *United States v. Martinez–Salazar*, the Supreme Court reiterated that reversal would be "require[d]" when (1) a biased juror is seated after (2) the trial court erroneously overruled an objection that the juror should be excused for cause.[26]   In *Martinez–Salazar*, a potential juror had indicated repeatedly and consistently that he would favor the prosecution,[27] and the trial court erred in failing to dismiss that person for cause.[28]   The actual holding of the Supreme Court was that even though the defendant used a peremptory challenge to remove the biased member of the venire and subsequently exhausted his remaining peremptory challenges, the defendant was "not deprived of any rule-based or constitutional right," because the jury that convicted him did not

---

[24] *Id.* (emphasis added).

[25] *Id.* at 89 (citing *Ferrell v. State*, 475 P.2d 825, 828 (Okla. Crim. App. 1970) and *Stott v. State*, 538 P.2d 1061, 1064-1065 (Okla. Crim. App. 1975)).

[26] *United States v. Martinez–Salazar*, 528 U.S. 304, 316 (2000) (citing *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988)).

[27] *Id.* at 308.

[28] *Id.* at 307 ("We focus on this sequence of events: the erroneous refusal of a trial judge to dismiss a potential juror for cause, followed by the defendant's exercise of a peremptory challenge to remove that juror.").

No. 13-70024

include a biased juror.[29]  But, in dicta, the Court discussed when the seating of a biased juror "would require reversal."[30]  The Court first stated that had the district court's erroneous refusal to dismiss the potential juror for cause "result[ed] in the seating of [a] juror who should have been dismissed for cause," then "that circumstance would require reversal."[31]  The "circumstance" requiring reversal included the *denial of a challenge for cause.*  The Court then quoted its statement in *Ross*: "'Had [the biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [the juror] for cause, the sentence would have to be overturned.'"[32]

The Supreme Court's listings of "structural errors" that require automatic reversal do not include jury bias, either when it is raised in a direct appeal or in habeas proceedings.[33]  A plurality opinion of the Supreme Court

---

[29] *Id.*

[30] *Id.* at 316.

[31] *Id.* (quoting *Ross*, 487 U.S. at 85).

[32] *Id.* (alterations in original) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 87 (1988)).

[33] *See, e.g., Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907-09, 1911 (2017) (explaining in a habeas proceeding that "[t]he purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial"; identifying "three broad rationales" for why the Court has sometimes deemed a particular error structural: (1) when "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest" and, "when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant,'" such as "the defendant's right to conduct his own defense"; (2) when the "effects of the error are simply too hard to measure," such as the denial of a defendant's "right to select his or her own attorney"; and (3) when "the error always results in fundamental unfairness," such as denying an indigent defendant an attorney or failing "to give a reasonable-doubt instruction"; emphasizing that "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case"; and holding that "when a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically"); *United States v. Davila*, 569 U.S. 597, __, 133 S. Ct. 2139, 2149 (2013) (explaining that the Court has "characterized as 'structural' 'a very limited class of errors' that trigger automatic reversal because they undermine the fairness of a criminal

No. 13-70024

said in a direct criminal appeal that "[t]he right to an impartial adjudicator, be it judge or jury, is" among the constitutional rights can never be treated as harmless error.[34]  But the Court has not held that automatic reversal is required whenever a biased juror is seated and a verdict is rendered by that jury.  In *Gomez v. United States*, the Supreme Court quoted the plurality opinion in *Gray*,[35] but *Gomez* did not involve a biased juror.  The Court held in *Gomez*, a direct criminal appeal, that the harmless error rule did not apply when, over the objection of the defendant, a magistrate judge exceeded his jurisdiction when he presided over the selection of a jury in a criminal case.[36]

Prior to the Supreme Court's decision in *Olano*,[37] more than one federal Circuit Court of Appeals held in the context of a direct criminal appeal that a defendant's failure to raise a juror's lack of impartiality would not be considered if the issue was not raised at trial and the factual basis of the bias claim was known at the time of trial.  In *United States v. Uribe*, a direct criminal appeal involving convictions for drug trafficking, one of the

---

proceeding as a whole" and observing that "[e]rrors of this kind include denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt") (citations omitted); *Neder v. United States*, 527 U.S. 1, 8 (1999) (identifying as structural errors "complete denial of counsel," "biased trial judge," "racial discrimination in selection of grand jury," "denial of self-representation at trial," "denial of public trial," and "defective reasonable-doubt instruction"). *But see, e.g., Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (BLACKMUN, J., plurality opinion). (holding in a direct criminal appeal that a harmless-error analysis did not apply when a state trial court excused a prospective juror for cause even though the juror was qualified to serve and had not exhibited bias).

[34] *Gray*, 481 U.S. at 668.

[35] *Gomez v. United States*, 490 U.S. 858, 876 (1989) (quoting *Gray*, 481 U.S. at 668).

[36] *Id.*

[37] *United States v. Olano*, 507 U.S. 725, 732-37 (1993) (explaining, in a direct criminal appeal, the plain-error doctrine embodied in FED. R. CRIM. P. 52(b), and setting forth its elements).

defendants, Rave, recognized a juror during empanelment,[38] but Rave did not "raise the matter" in the trial court.[39] After a guilty verdict was returned, the juror testified that he had rented a hoist to Rave and "experienced some problems getting it back," but "that, after some travail, Rave returned the equipment and paid for its use."[40] There was also evidence that there were "hard feelings" between this juror and another defendant with whom Rave was jointly tried because the other defendant had not paid the juror for automobile repairs.[41] The First Circuit held that "[a]lthough Rave . . . attempts to argue that [the juror's] presence tainted his conviction, he never raised the matter below. He is, therefore, foreclosed on appeal."[42] The court reasoned that "[s]urely, the raise-or-waive rule is fully operative in respect to these rulings"[43] and that the "plain-error doctrine [is] to be invoked 'sparingly' and only to avert 'miscarriage of justice.'"[44]

Similarly, in *United States v. Rodriguez-Garcia*, a direct criminal appeal decided before *Olano*, the Tenth Circuit affirmed a conviction and refused to consider a claim of juror bias raised for the first time on appeal when the basis for the bias could have been pursued with the trial court.[45] In that case, the defendant contended "that he did not receive an impartial jury as guaranteed by the Sixth Amendment and [was] therefore entitled to a new trial" because he knew and had worked at a hospital with one of the jurors, and that juror

---

[38] 890 F.2d 554, 560 (1st Cir. 1989).

[39] *Id.* at 560 n.4.

[40] *Id.* at 560.

[41] *Id.*

[42] *Id.* at 560 n.4.

[43] *Id.* (citing *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir. 1987) and *United States v. Frady*, 456 U.S. 152, 163 n. 14 (1982)).

[44] *Id.* (quoting *Frady*, 456 U.S. at 163 n.14).

[45] *United States v. Rodriguez–Garcia*, 983 F.2d 1563, 1572-73 (10th Cir. 1993).

No. 13-70024

had not admitted to knowing him.[46]    The defendant's "counsel failed to challenge this juror" and raised the "claim of juror bias" for the first time on appeal.[47]    The Tenth Circuit reasoned that "[t]his court has observed that 'there may be situations where the litigant waives any objection to the composition of the jury by failing to pursue the matter in timely fashion [which] is consistent with the general rule that a defendant, by accepting a jury, waives his right to object to the panel.'"[48]    This decision likewise indicates that the Tenth Circuit did not view potential juror bias known to a defendant or counsel as automatically requiring reversal when no for-cause challenge was raised in the trial court.[49]

Even after *Olano*, as discussed above, the Eighth Circuit has held that when the basis for a bias claim is known at the time of trial and no for-cause challenge is made, a defendant cannot obtain reversal on appeal, because that would be tantamount to insuring a risk-free trial.[50]    In *Johnson*, Juror S.R. stated during *voir dire* that there was a possibility that she could not be objective and might give more weight or find more credible the testimony of a law enforcement officer because her former roommate and very good friend was a parole and probation officer.[51]    The Eighth Circuit concluded that "by failing

---

[46] *Id.* at 1572.

[47] *Id.*

[48] *Id.* at 1572-73 (alteration in original) (quoting *United States v. Diaz–Albertini*, 772 F.2d 654, 657 (10th Cir. 1985)).

[49] *See also United States v. Harris*, 530 F.2d 576, 579-80 (4th Cir. 1976) (rejecting in a direct criminal appeal the defendant's contention that "one of the jurors knew him before trial and may have been prejudiced against him," reasoning that "[w]here the basis for a challenge to a juror could be timely shown the failure of the defendant to object at the inception of the trial constituted a waiver of his right to challenge the constitution of the jury").

[50] *See United States v. Johnson*, 688 F.3d 494, 501-02 (8th Cir. 2012).

[51] *Id.* at 500.

to object to the seating of Juror S.R. during voir dire, [the defendant] 'intentional[ly] relinquish[ed] or abandon[ed] . . . a known right'" within the meaning of *Olano* and "thereby waived his right to challenge the impaneling of an allegedly biased juror on direct appeal."[52]   The Eighth Circuit also disavowed a prior decision in a habeas proceeding that had reasoned "[w]hen a defendant fails to object to the qualifications of a juror, he is without remedy only if he fails to prove actual bias," reasoning that the habeas decision was contrary to an earlier opinion of the Eighth Circuit, which controlled.[53]   The court further expressed its conclusion that the earlier decision correctly set forth the standard of review since otherwise a defendant could choose to withhold an objection for cause, await a verdict, then appeal and reverse an adverse judgment.[54]

In the present case, the district court denied Austin's juror bias claim on the sole basis that "Austin had an opportunity to question the potential jurors, and challenge those he thought unsuitable, but he chose not to do so"[55] and that "[h]e has therefore waived this claim."[56]   In our order granting a COA on Austin's juror bias issue, we said that "claims based on actual bias, as opposed to implied bias, are not waived by a failure to object during voir dire."[57]   This was not intended as an all-encompassing, broadly sweeping proposition of law. The sole decision we cited for this statement was vacated in its entirety by the

---

[52] *Id.* at 501.

[53] *Id.* (citing and quoting *Johnson v. Armontrout*, 961 F.2d 748, 751 (8th Cir. 1992)).

[54] *Id.* at 501-02.  *But see United States v. Brown*, 26 F.3d 1124, 1126 (D.C. Cir. 1994) (concluding that "plain error analysis is applicable to a sixth amendment claim not raised at trial").

[55] ROA.2799 (citing 3 Tr. at 3-79; 4 Tr. at 3-66; 5 Tr. at 3-90).

[56] *Id.*

[57] *Austin v. Davis*, 647 F. App'x 477, 493 (5th Cir. 2016).

grant of en banc rehearing in our court[58] and therefore was not a precedential decision.  Additionally, the statement in the vacated opinion was dicta.[59]  A claim of actual bias may be raised even if no objection was made during *voir dire,* depending on the facts of a particular case and its procedural posture.  This would be the case, for example, when neither a defendant nor her counsel had a reason to know of the bias and *voir dire* questioning would not have revealed the bias.  But the decided weight of the authorities in this area, discussed above, concludes that there are circumstances when the failure to object or move to strike a juror for cause precludes reversal of the verdict on appeal or in habeas proceedings based on juror bias.

To be clear, I am not suggesting that Austin waived his claim of juror bias by failing to question the jurors during *voir dire*.  Rather, an alternate ground for affirming the district court's judgment regarding the jury bias claim is that one of *McDonough*'s requirements—that besides showing "that a juror failed to answer honestly a material question on *voir dire*" a claimant must "further show that a correct response would have provided a valid basis for a challenge for cause"[60]—necessarily assumes that, had *voir dire* provided a valid basis for making a for-cause challenge, the claimant would have made the challenge.  Because Austin made a conscious decision as a matter of trial strategy to accept all jurors accepted by the State, and because the record supports the conclusion that Austin would not have challenged the jurors for cause had they expressed during *voir dire* what they expressed in the post-trial

---

[58] *Id*. at 493 n.64 (citing *United States v. Wilson*, 116 F.3d 1066, 1086-87 (5th Cir.1997), *rev'd on other grounds, United States v. Brown*, 161 F.3d 256, 258 (5th Cir.1998) (en banc)).

[59] *See Wilson*, 116 F.3d at 1087.

[60] *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

No. 13-70024

statements, Austin cannot now say that he has met *McDonough*'s requirements.

## II

It is unclear whether, in a habeas proceeding, a defendant would be entitled to have a jury's verdict set aside upon establishing the elements of *McDonough*, without an assessment of the impact of the constitutional error on the state-court criminal trial. It is also unclear whether 28 U.S.C. § 2111 applies. It provides that "[o]n the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."[61] It would seem that in many if not most cases when both prongs of *McDonough* are met the impact on the trial would obviously be injurious or the substantial rights of a party would be affected. But the present case is a relatively unusual one. To the extent that the analysis set forth by the Supreme Court in *Fry v. Pliler*,[62] and *Brecht v. Abrahamson*[63] applies, any constitutional error that occurred because any one of the five challenged jurors participated in the verdict did not have a substantial and injurious impact on the verdict.

In assessing harmlessness on direct review, the Government bears the burden of proving that a constitutional error was "harmless beyond a reasonable doubt."[64] On collateral review, however, "concerns about finality, comity, and federalism,"[65] mandate that a federal habeas petitioner bears the

---

[61] 28 U.S.C. § 2111.

[62] 551 U.S. 112 (2007).

[63] 507 U.S. 619 (1993).

[64] *Chapman v. California*, 386 U.S. 18, 24 (1967).

[65] *Fry v. Pliler*, 551 U.S. 112, 116 (2007).

burden, and the standard is whether the error actually prejudiced him.[66]  To determine whether an error actually prejudiced the petitioner, courts inquire whether the error had "a substantial and injurious effect or influence" on a jury verdict,"[67] meaning "there is *more* than a mere reasonable possibility that it contributed to the verdict."[68]

In this case, Austin's guilt was not in question.  He pled guilty.  During the trial on the question of the appropriate penalty—life or death—Austin consistently vocalized and pursued a strategy designed to persuade the jury to answer the Texas special issues such that he received the death penalty.  Austin did not testify.[69]  He did cross-examine one witness and make a closing statement; during both, he only contested the State's suggestion to the jury that he was a pedophile.[70]  Austin expressed to the jury at closing that he would kill again and explained why the jury should answer the special issues such that he received a death sentence.[71]  Although some evidence of Austin's

---

[66] *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry*, 551 U.S. at 117, 121-22 (noting that *Brecht* "clearly assumed that the *Kotteakos* standard would apply in virtually all § 2254 cases" and "suggested an exception only for the 'unusual case' in which 'a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, . . . infects the integrity of the proceeding'" and holding that the *Brecht* standard applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*"); *Hogue v. Johnson*, 131 F.3d 466, 498-99 (5th Cir. 1997) (concluding that the *Brecht* standard applies to determine whether a constitutional error was harmless in a federal habeas challenge even when no state court reviewed petitioner's claim and therefore never determined whether the error was harmless).

[67] *Brecht*, 507 U.S. at 637; *see also Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998) ("Based upon the forgoing circumstances, combined with the overwhelming evidence of Fitzgerald's guilt, his propensity for future dangerousness, and the vileness of his crimes, we are confident that Bradshaw's presence on the jury did not result in actual prejudice to Fitzgerald.").

[68] *Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir. 1996) (emphasis in original); *see also United States v. Bowen*, 799 F.3d 336, 356 (5th Cir. 2015).

[69] 10RR78.

[70] 9RR125-26; 11RR15-18.

[71] 11RR16, 19-20.

mental health history was presented to the jury during the sentencing phase, Austin himself presented no mitigating evidence.  It cannot be said that any error had a substantial and injurious effect on the verdict.